[No. B113595. Second Dist., Div. One. Sept. 24, 1997.†]

FIREMAN'S FUND INSURANCE COMPANY, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
VICKERS INCORPORATED, Real Party in Interest.

†Review granted December 23, 1997. Opinion ordered published August 12, 1998, and review subsequently dismissed as improvidently granted on October 14, 1998, with directions that the opinion remain published.

**COUNSEL**

Caron, McCormick, Constants & Goldberg, Coran, McCormick, Gordon & Constants, Donald W. McCormick and Jeffrey A. Turkell for Petitioner.

No appearance for Respondent.

Rodi, Pollock, Pettker, Galbraith & Cahill, Tim G. Ceperley, John F. Cermak, Jr., Cooper, Walinski & Cramer, Joseph P. Thacker and Terrell A. Allen for Real Party in Interest.

**OPINION**

**VOGEL (Miriam A.), J.**—In *Foster-Gardner, Inc.* v. *National Union Fire Ins. Co.* ▌ (Cal.App.), Division Two of our court held that an insurer's duty to defend any "suit" includes a duty to defend an administrative "claim." In the case now before us, we reach the opposite conclusion.

BACKGROUND

From 1971 to 1985, Vickers Incorporated was insured by Fireman's Fund Insurance Company under four comprehensive general liability (CGL) insurance policies, all of which included the following language: "The Company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of . . . bodily injury or . . . property damage to which this insurance applies, caused by an occurrence, *and the Company shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury or property damage . . . and may make such investigation and settlement of any claim or suit as it deems expedient,* but the Company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the Company's

liability has been exhausted by payment of judgments or settlements."[1] (Emphasis added.)

In 1991 and 1992, the Regional Water Quality Control Board (RWQCB) and the United States Environmental Protection Agency (EPA) notified Vickers that it is a potentially responsible party (PRP) under the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA, 42 U.S.C. § 9601 et seq.) and, as such, potentially liable for the investigation and remediation of soil and groundwater contamination at Vickers' Los Angeles facility.[2] There are several orders to the same effect, but no lawsuits have been filed against Vickers by the RWQCB or the EPA (or, for that matter, by any other agency).[3]

---

[1] The policies were issued to Vickers' predecessor, Sterer Engineering & Manufacturing Company, and the subsequent demands for a defense were submitted not just by Vickers but also by Vickers' parent company, Trivona Corporation. For present purposes, we assume that, but for the issue before us, Fireman's Fund would have a duty to defend Vickers and Trivona. For simplicity, we refer to Vickers as the insured and we refer to a singular policy of insurance (because the relevant language is the same in all four policies).

[2] There are other PRP's, persons who were or are owners and operators of the several sites located within the same "Study Area" as Vickers' facility.

[3] These are the orders: (1) On January 3, 1991, the RWQCB notified Vickers that conditions at its facility "may have resulted in soils and potentially groundwater pollution" and directed Vickers "to submit a work plan for conducting a subsurface investigation to determine whether contaminants have infiltrated into the soil underlying [the site]." The consequences of noncompliance were not stated. (2) On November 14, 1991, the RWQCB responded to Vickers' proposed work plan and directed Vickers to include specified additional items and resubmit its work plan. The consequences of noncompliance are not stated. (3) On November 13, 1992, the EPA sent a "General Notice of Liability" to Vickers, notifying it that the EPA had documented a release of hazardous substances at the site, that the EPA had thus incurred (and would continue to incur) investigation and cleanup costs, that Vickers is a PRP under CERCLA and that, as such, it might be obligated to pay for the EPA's costs and for remediation work at the site. Although the notice does not expressly state the consequences of noncompliance, it does cite to the statutory scheme and it also explains that the "EPA encourages good faith negotiations between the PRPs and [the] EPA." (4) In June 1993, the EPA issued a "Record of Decision" describing its interim and long-term remediation plans for the site. The 62-page record explains that, as of that time, the EPA had issued preliminary PRP notices to 19 parties "preliminarily identified as owners and operators of twelve facilities located" in the same study area as the site on which the Vickers facility is located, but there is nothing in the record about the EPA's enforcement options. (5) On October 19, 1993, the EPA sent Vickers a "Remedial Design Notice Letter" requesting Vickers' participation in negotiations for a "Consent Decree" concerning the remediation plan and explaining that, absent a settlement, the EPA's options included (a) issuance by it of a unilateral order to the PRP's to require them to perform the required work and (b) performance by the EPA of the remedial work and civil litigation against the PRP's to recover the costs thereby incurred. (6) In March 1994, the EPA, Vickers and several other PRP's signed a consent order concerning the financing of the remediation work, pursuant to which the EPA reserved its right to "take any enforcement action" against Vickers for the recovery of costs. (7) On October 12, 1995, the EPA wrote to Vickers to encourage its participation in further settlement discussions concerning the EPA's oversight costs, and to demand reimbursement of its costs incurred to

In May 1991, Vickers notified Fireman's Fund that it had received the notices and demanded a defense in the administrative proceedings. Fireman's Fund denied any obligation to defend on the ground that the agencies' demands were not "suits" within the meaning of the policy. In April 1996, Vickers sued Fireman's Fund (and others) for declaratory relief and damages for breach of contract. After Fireman's Fund answered, Vickers moved for summary adjudication (Code Civ. Proc., § 437c, subd. (f)), asking the trial court to determine that Fireman's Fund "has a duty to defend Vickers against claims asserted against . . . Vickers . . . by both the RWQCB and the []EPA concerning groundwater contamination at the [s]ite." Fireman's Fund opposed the motion, admitting the facts relevant to this issue (as summarized above) but disputing Vickers' construction of the policy.

Relying on *Aetna Cas. and Sur. Co., Inc.* v. *Pintlar Corp.* (9th Cir. 1991) 948 F.2d 1507,[4] the trial court granted Vickers' summary adjudication motion, holding that the demands, notices and orders were the "functional equivalent" of a "suit" and that, therefore, Fireman's Fund has a duty to defend Vickers "against claims asserted against [it] by the RWQCB and the EPA concerning groundwater contamination at the site." Fireman's Fund then filed a petition for a writ of mandate, asking us to decide, "What is a suit?" By coincidence, Division Two's opinion in *Foster-Gardner, Inc.* v. *National Union Fire Ins. Co.*\* (Cal.App.) had just been filed, answering Fireman's Fund's question in Vickers' favor by holding that "suit" includes a "claim." Not surprisingly, therefore, Vickers suggested the issue was moot. Since we questioned *Foster-Gardner*'s conclusion, we issued an order to show cause with a briefing schedule and set the matter for argument.

DISCUSSION

I.

*Foster-Gardner*

The facts before the court in *Foster-Gardner* are substantively indistinguishable from our facts. While Foster-Gardner was insured by National

---

date, plus interest ("at least $21,743,970"). The letter explains that, absent a negotiated resolution of the remaining issues, the EPA could choose from among several options, including "civil litigation against the PRPs . . . ." (8) On March 21, 1996, the EPA advised Vickers that, based upon the withdrawal of certain PRP's from the Consent Decree negotiations, the EPA would exercise its police power to require Vickers and the other PRP's to implement the initial stages of the remediation plan. (9) In November 1996, the EPA issued a "Unilateral Administrative Order" directing Vickers and the other PRP's to implement specified interim remedies at the site.

[4]Although *Pintlar* is a Ninth Circuit case, it applies the law of Idaho, not California. (*Aetna Cas. and Sur. Co., Inc.* v. *Pintlar Corp., supra,* 948 F.2d at p. 1513.)

\*See Reporter's Note on page 1207.

Union and others under several CGL policies, the California Environmental Protection Agency notified Foster-Gardner that it was a party potentially responsible for the cleanup of a specified site and ordered Foster-Gardner to conduct an investigation and remediate the contamination. The order was made under the Carpenter-Presley-Tanner Hazardous Substance Account Act (HSAA, Health & Saf. Code, § 25300 et seq.) which (as relevant) is essentially the same as CERCLA in that the order did not "commence either a lawsuit in court or an adjudicative procedure before an administrative tribunal. Instead, it [was] simply an order from an administrative agency." (*Foster-Gardner, Inc.* v. *National Union Fire Ins. Co.*\* (Cal.App.).) Foster-Gardner gave notice to National Union and demanded that it " 'defend' the 'proceedings' commenced" by the order. Relying on the same policy language now relied on by Fireman's Fund, National Union refused to provide a defense.

The issue in *Foster-Gardner* was whether the HSAA proceedings constituted a "suit" as that term is used in the CGL policies. After noting that a "prominent consideration" in deciding this issue is the "prejudice that an insured can suffer before any proceeding is commenced in court" (*Foster-Gardner, Inc.* v. *National Union Fire Ins. Co.*\* (Cal.App.).) Division Two explained the conflicting approaches adopted by the courts of other jurisdictions, the two major ones being the "literal meaning" and the "functional equivalent" approaches.

The "literal meaning" approach is illustrated by the decision in *City of Edgerton* v. *General Cas. Co.* (1994) 184 Wis.2d 750 [517 N.W.2d 463, 48 A.L.R.5th 803] where the Wisconsin Supreme Court found no ambiguity in the term "suit," held that the insured's expectations could not be satisfied in contradiction to policy language that clearly identified the scope of coverage, and concluded that "neither a PRP letter nor a comparable notification letter by a state agency . . . triggers the insurers' duty to defend" because these notices do not have the "attributes of a 'suit.' " Although the tone of the letters might be confrontational, they do not "by themselves impose liability . . . if the [insureds] fail[] to respond . . . ." Instead, "something more in the form of a court proceeding would be required to 'force or compel the insured to take action or suffer serious consequences.' " (*Id.* at pp. 473-475, italics omitted; see also *Lapham-Hickey Steel* v. *Protection Mut. Ins.* (1995) 166 Ill.2d 520 [211 Ill.Dec. 459, 655 N.E.2d 842, 847]; *Patrons Oxford Mut. Ins. Co.* v. *Marois* (Me. 1990) 573 A.2d 16, 18-20; *Ray Industries, Inc.* v. *Liberty Mut. Ins. Co.* (6th Cir. 1992) 974 F.2d 754, 761-762.)

The "functional equivalent" approach is illustrated by the decision in *Mich. Millers Mut. Ins.* v. *Bronson Plat.* (1994) 445 Mich. 558 [519 N.W.2d

---

\*See Reporter's Note on page 1207.

864], where the Michigan Supreme Court held that the term "suit" could refer to "some legal action other than a court proceeding initiated by a complaint" and should be so construed because "a broader definition of the term 'suit' reflects more accurately the modern realities of our legal system [including the use of] less formal and more expeditious means of dispute resolution. This movement has manifested itself in the . . . increased authority given to administrative agencies to resolve disputes, so that the functional equivalents of suits brought in a court of law have developed. . . . [T]his point is particularly valid in the context of CERCLA actions . . . where significant legal prejudice may develop if the PRP fails [to comply]." (*Id.* at pp. 868, 870; see also *Aetna Cas. and Sur. Co., Inc.* v. *Pintlar Corp., supra,* 948 F.2d at pp. 1516-1517; *Hazen Paper* v. *U.S. Fidelity and Guar.* (1990) 445 Mass. 689 [555 N.E.2d 576, 580-581]; *Coakley* v. *Maine Bonding and Cas. Co.* (1992) 136 N.H. 402 [618 A.2d 777, 786-787]; *Avondale Industries, Inc.* v. *Travelers Indem. Co.* (2d Cir. 1989) 887 F.2d 1200, 1206.)

*Foster-Gardner* then discusses the "approach of the *AIU* case," meaning *AIU Ins. Co.* v. *Superior Court* (1990) 51 Cal.3d 807 [274 Cal.Rptr. 820, 799 P.2d 1253]. (*Foster-Gardner, Inc.* v. *National Union Fire Ins. Co.** (Cal.App.).) In *AIU,* our Supreme Court considered whether CERCLA response costs are "damages" within the meaning of the standard CGL policy (the carrier agreed to pay such sums as the insured "shall become legally obligated to pay as damages") and held that, *either* by the *plain meaning* of the term *or* by application of the usual rules governing interpretation of an *ambiguous* policy term, "damages" includes coverage for most response costs. (*AIU Ins. Co.* v. *Superior Court, supra,* 51 Cal.3d at pp. 825-828.)[5] As viewed by *Foster-Gardner,* the important part of *AIU* is the Supreme Court's refusal to interpret "damages" in a " 'technical or restrictive manner,' " which *Foster-Gardner* understood to be a permissible approach simply because " 'damages' was not defined in the [AIU] policy." (*Foster-Gardner, Inc.* v. *National Union Fire Ins. Co.** (Cal.App.).)

It follows, according to *Foster-Gardner,* that given the Supreme Court's application in *AIU* of a nontechnical, "functional" approach to determine "damages," there is no "principled basis" on which a technical and literal analysis could control the "suit" issue. (*Foster-Gardner, Inc.* v. *National Union Fire Ins. Co.** (Cal.App.).) Noticeably absent from *Foster-Gardner* is any discussion about the policy language itself, or whether it is ambiguous,

---

*See Reporter's Note on page 1207.

[5]In *AIU,* the insured had been *sued* by the governmental agencies and had demanded *coverage* for cleanup and other CERCLA response costs. (*AIU Ins. Co.* v. *Superior Court, supra,* 51 Cal.3d at pp. 813-815.) The issue raised in *Foster-Gardner* and in our case was not raised in *AIU.*

or how it is possible to apply the *AIU* result without the *AIU* analysis. Instead, *Foster-Gardner* simply assumes sub silentio that a California court is at liberty to interpret a policy to avoid "the prejudice that an insured [would otherwise] suffer" without a covered defense in the CERCLA proceedings. (*Foster-Gardner, Inc.* v. *National Union Fire Ins. Co.** (Cal.App.).)

Vickers contends *Foster-Gardner's* analysis is sound. Fireman's Fund disagrees, and so do we. In our view, *Foster-Gardner's* failure to consider the threshold issues—the plain meaning of "suit" and "claim" and whether those terms are ambiguous—is fatal to its analysis and to its decision to rewrite an insurance policy to afford coverage where none was purchased. (See *City of Edgerton* v. *General Cas. Co., supra,* 517 N.W.2d at p. 476, fn. 26 [the "original risk assessment becomes a nullity if the language of the policy is redefined in order to expand coverage beyond what was planned for by the insurer in the contract of insurance"].) ■■■ As we will explain, we find no ambiguity in Fireman's Fund's policy insofar as this issue is concerned, and we therefore conclude that, under the plain meaning of its policy, its duty is to defend suits, not claims.[6]

## II.

### *The Distinction Between "Suit" and "Claim" Is Not Ambiguous*

#### A.

■■■ In California,. an insurance policy is a contract, subject to interpretation according to the rules applied to all contracts. Accordingly, we look first to the language of the contract in order to ascertain its plain meaning or the meaning a layperson would ordinarily attach to it. If that language is clear and explicit, it *must* be given effect, and a policy provision will not be considered ambiguous unless it is capable of two or more constructions, *both* of which are reasonable. Of course, as is true of any contract, we must interpret the policy as a whole, not in the abstract, and we will not strain to create an ambiguity where none exists or indulge in tortured constructions to divine some theoretical ambiguity in order to find coverage where none was

---

*See Reporter's Note on page 1207.

[6]*Foster-Gardner* suggests that its conclusion is the only right one because any other result would create a discordant process in which the " 'damages' covered by a CGL policy would be determined in a proceeding not covered by the CGL policy." (*Foster-Gardner, Inc.* v. *National Union Fire Ins. Co.** (Cal.App.).) We disagree. *AIU's* holding—that there is *coverage* for certain *damages* sought in a third party suit prosecuted by the EPA under CERCLA— has nothing to do with whether the carrier has a *duty to defend* when no third-party suit has been filed. And as Fireman's Fund points out, this anomaly is more imagined than real since insurance companies routinely pay "claims" that have not ripened into "suits" and which therefore have not triggered a defense obligation.

contemplated. (*Waller* v. *Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 18-19 [44 Cal.Rptr.2d 370, 900 P.2d 619]; *Bank of the West* v. *Superior Court* (1992) 2 Cal.4th 1254, 1264-1265 [10 Cal.Rptr.2d 538, 833 P.2d 545]; *Titan Corp.* v. *Aetna Casualty & Surety Co.* (1994) 22 Cal.App.4th 457, 469 [27 Cal.Rptr.2d 476]; *Blumberg* v. *Guarantee Ins. Co.* (1987) 192 Cal.App.3d 1286, 1296 [238 Cal.Rptr. 36].)

### B.

In *AIU Ins. Co.* v. *Superior Court, supra,* 51 Cal.3d 807, the Supreme Court found that the "plain meaning" of the term "damages" afforded coverage but that, assuming an ambiguity, the result would be the same. (*Id.* at p. 814.)[7] *AIU* does *not* hold that every term not defined in the policy is ambiguous, only that, in the absence of a policy definition, the term will be interpreted according to its " 'ordinary and popular' definition." (*Id.* at p. 825.) Certainly there is nothing in *AIU* to suggest a rejection of the settled rule that the mere absence of a policy definition does not per se result in ambiguity (*Castro* v. *Fireman's Fund American Life Ins. Co.* (1988) 206 Cal.App.3d 1114, 1120 [253 Cal.Rptr. 833]), and the Supreme Court's post-*AIU* decisions reaffirm the rule that an ambiguity will not be found unless a policy provision is capable of two or more *reasonable* constructions. (*Waller* v. *Truck Ins. Exchange, Inc., supra,* 11 Cal.4th at p. 18.) In short, whatever public policy considerations there may be for or against the *Foster-Gardner* decision, *AIU* eliminates those considerations from our analysis—because the issue "is not whether CGL policies *may* provide the coverage sought, but whether they *do* provide it according to their terms.

---

[7]In *AIU,* where it was clear that if the insured was held liable in the underlying actions, the insured would be "obligated" to pay for whatever relief that court ordered, the Supreme Court viewed the only real question to be whether "that obligation may be considered 'legal' under applicable rules of interpretation." (*AIU Ins. Co.* v. *Superior Court, supra,* 51 Cal.3d at p. 824.) The insurers contended it would not be a "legal" obligation because an order obligating the insured to reimburse the agencies' costs would be an exercise of "equitable" rather than "legal" authority. (*Ibid.*) The court disagreed, concluding that an insured is "legally obligated" to comply with injunctive orders (so that the meaning of the term is plain) but that, assuming an ambiguity, the reasonable construction of the words had to encompass the type of relief sought in the third party suits. (*Id.* at pp. 824-825.) The Supreme Court also considered the word "damages" and held that: "Because the CGL policies do not define the word 'damages,' for interpretation purposes we look to its 'ordinary and popular' definition. . . . Section 3281 of the Civil Code provides: 'Every person who suffers detriment from the unlawful act or omission of another, may recover from the person in fault a compensation therefor in money, which is called damages.' As our cases have pointed out, this provision is intended to represent the plain and ordinary meaning of the word 'damages.' . . . Other lay and legal definitions are similar." (*Id.* at pp. 825-826.) The court then went on to reject alternative interpretations that were either more narrow and technical than the statutory or case law definitions or broader than those definitions (*id.* at pp. 826-828) and, finally, applied the statutory definition to the basic forms of relief sought in the third party actions (*id.* at pp. 828-842).

The answer is to be found solely in the language of the policies, not in public policy considerations." (*AIU Ins. Co.* v. *Superior Court, supra,* 51 Cal.3d at p. 818.)[8]

 As we will now explain, we believe the words at issue in our case are clear and unambiguous and must be interpreted according to their plain meaning. It follows that we disagree with *Foster-Gardner, Inc.* v. *National Union Fire Ins. Co.*\* (Cal.App.), and disagree with the notion that *AIU* somehow compels rejection of the literal meaning approach.

1.

In the "Coverage Part," the policy provides: "The Company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of . . . bodily injury or . . . property damage to which this insurance applies, caused by an occurrence, *and the Company shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury or property damage . . . and may make such investigation and settlement of any claim or suit as it deems expedient,* but the Company shall not be obligated to *pay any claim or judgment or to defend any suit* after the applicable limit of the Company's liability has been exhausted by payment of judgments or settlements." (Emphasis added.)

Under "Limits of Liability," the policy provides: "Regardless of the number of . . . *claims made or suits brought* on account of bodily injury or property damage, the Company's liability is limited [as thereafter stated]." (Italics added.)

---

[8]In our case, the trial court's order granting Vickers' summary adjudication motion suggests that because it is in the nation's best interests to have hazardous waste cleaned up, our courts must construe insurance policies to provide coverage for such remedial work lest the insureds be discouraged from cooperating with the EPA. While we agree that it is in everyone's best interests to have hazardous wastes cleaned up, we do not agree that a California court may rewrite an insurance policy for that purpose or for any purpose. This is a contract issue, and imposition of a duty to defend CERCLA proceedings that have not ripened into suits would impose on the insurer an obligation for which it may not be prepared. "Typically, insurers assess the extent of the risks insured under policies issued. The risk of liability may then be spread among groups of insureds and premiums assigned only after the extent of the risk is determined. The original risk assessment becomes a nullity if the language of the policy is redefined in order to expand coverage beyond what was planned for by the insurer in the contract of insurance. Policies of insurance, premised upon a certain level of predictability and assessment of risk at the time of contracting, lose their effect without the inclusion of certain basic definitions." (*City of Edgerton* v. *General Cas. Co., supra,* 517 N.W.2d at p. 476, fn. 26.) Whatever merit there may be to these conflicting social and economic considerations, they have nothing whatsoever to do with our determination whether the policy's disjunctive use of "suit" and "claim" creates an ambiguity.

\* See Reporter's Note on page 1207.

Under a listing of the "Insured's Duties in the Event of Occurrence, Claim or Suit," the policy provides: *"If claim is made or suit is brought against the insured,* the insured shall immediately forward to the Company every demand, notice, summons or other process received by him or his representative." (Italics added.)

The language of the Fireman's Fund policy is substantively indistinguishable from the policy language at issue in *Foster-Gardner. (Foster-Gardner, Inc.* v. *National Union Fire Ins. Co.\** (Cal.App.).)

2.

In plain English, the Fireman's Fund policy states that Fireman's Fund has the *right and duty to defend any suit seeking damages* against Vickers and *the right, but not the duty, to "make such investigation and settlement of any claim or suit as it deems expedient."* This distinction between "suits" and "claims" can be found throughout the policy and is not limited to the duty to defend provision. For example, the policy provides that Fireman's Fund is not "obligated to *pay any claim* or judgment or to *defend any suit"* after the policy's limits are exhausted; that, regardless of "the number of . . . *claims made or suits brought,"* the carrier's liability is limited as provided in the policy; and that, "[i]*f a claim is made or suit is brought"* against Vickers, Vickers must immediately forward to Fireman's Fund "every demand, notice, summons or other process" it has received. (All emphasis added.) In short, the policy does not lump suits and claims together, but consistently treats them separately.

The distinction between "suit" and "claim" is designed to limit Fireman's Fund's obligations under the policy so that it will not incur the expense of defending its insured in administrative proceedings initiated by a claim instead of a suit. Unless there is something unclear about this language, the limitation is proper and it is not up to us to create coverage where none was intended or purchased. (*Titan Corp.* v. *Aetna Casualty & Surety Co., supra,* 22 Cal.App.4th at p. 469.) We find nothing ambiguous about the distinction.

First, a construction that reads "suit" to include a "claim" makes the reference to "claim" superfluous and leaves us with no explanation for the disjunctive use of the two words, a result that is contrary to accepted rules of interpretation. (*Producers Dairy Delivery Co.* v. *Sentry Ins. Co.* (1986) 41 Cal.3d 903, 916-917 [226 Cal.Rptr. 558, 718 P.2d 920] [words separated by the disjunctive "or" are presumed to have independent meanings].) The way we read the policy, the EPA's demands are a "claim" against Vickers, giving

*See Reporter's Note on page 1207.

rise to Vickers' duty to notify Fireman's Fund of its existence so that Fireman's Fund can determine whether to investigate and settle that claim. If the claim is not resolved and the EPA sues Vickers, Fireman's Fund's duty to defend Vickers will be triggered (subject to whatever other limitations there may be).

Second, in their ordinary and popular sense, the words "suit" and "claim" have different meanings. ■ A suit is a formal proceeding initiated in a court of law under established procedures, where it is tried before a judge or jury subject to traditional rules of evidence and which results in a judgment. (Oxford English Dict. (2d ed. 1989) p. 147, col. 1 [a "suit" is the "action of suing in a court of law; legal prosecution; hence, litigation"]; Webster's Tenth New Collegiate Dict. (1987) ["suit" is "an action or process in a court for the recovery of a right or claim"]; Black's Law Dict. (6th ed. 1990) p. 1434, col. 1 [a "suit" is a proceeding by one person against another person "in a court of law in which the plaintiff pursues, in such court, the remedy which the law affords him for the redress of an injury or enforcement of a right"].) A "claim" can be any number of things, none of which rise to the formal level of a suit—it may be a demand for payment communicated in a letter, or a document filed to protect an injured party's right to sue a governmental entity, or the document used to initiate a wide variety of administrative proceedings. (*Safeco Surplus Lines Co.* v. *Employer's Reinsurance Corp.* (1992) 11 Cal.App.4th 1403, 1407 [15 Cal.Rptr.2d 58] [a "claim" is " ' " ' the assertion, demand or challenge of something as a right; the assertion of a liability to the party making it do some service or pay a sum of money' " ' "]; *Phoenix Ins. Co.* v. *Sukut Construction Co.* (1982) 136 Cal.App.3d 673, 677 [186 Cal.Rptr. 513] [a claim, both in its ordinary meaning and as interpreted by the courts, is "a demand for something as a right, or as due [and a] formal lawsuit is not required before a claim is made"].) While a claim may ultimately ripen into a suit, "claim" and "suit" are not synonymous.

Third, there is no other *reasonable* construction of "suit" and "claim" in this context and, as noted above, the terms of a policy will not be considered ambiguous unless they are capable of two or more constructions, both of which are reasonable. (*Waller* v. *Truck Ins. Exchange, Inc.*, *supra*, 11 Cal.4th at pp. 18-19; *Bay Cities Paving & Grading, Inc.* v. *Lawyers' Mutual Ins. Co.* (1993) 5 Cal.4th 854, 867 [21 Cal.Rptr.2d 691, 855 P.2d 1263].) Of course, there is the "functional equivalent" approach relied on in *Foster-Gardner* but we do not view that construction as "reasonable." What is there in the *policy* to support an interpretation of "suit" to include some "claims" but not others? When and under what circumstances would a "claim" be treated as a suit? If the seriousness of the "claim" transforms it into a "suit," who

determines what is serious and what is not? Which "claims" are the "functional equivalent" of a suit? Does the dollar amount of the insured's potential liability determine "seriousness?" To answer these questions, we would have to rewrite all of these policies on a case-by-case basis, and that we cannot and should not do.

Fourth, other courts have held that this language is clear and unambiguous. As *Foster-Gardner* explains, the issue now before us has been litigated around the country, primarily in the context of CERCLA proceedings and similar administrative actions pursued by state agencies. (*Foster-Gardner, Inc.* v. *National Union Fire Ins. Co.\** (Cal.App.).) As we have explained, there are two competing interpretations—one that finds coverage where the "claim" is the "functional equivalent" of a "suit" (the *Foster-Gardner* view), the other that gives effect to the "literal meaning" of the policy's language. In practical terms, our holding constitutes adoption of the "literal meaning" approach, at least where (as here) there is no ambiguity. Other decisions adopting this view help explain why, in the first instance, there is no ambiguity. By way of example:

—*Lapham-Hickey Steel* v. *Protection Mut. Ins., supra*, 655 N.E.2d 842, held that PRP notices from the EPA and the Minnesota Pollution Control Agency to Lapham-Hickey did not trigger Protection Mutual's duty to defend its insured because they did not constitute a "suit." (*Id.* at p. 848.) This is the way the Illinois Supreme Court viewed the policy language now before us: "[T]he policy refers to both a 'suit' and a 'claim' within different contexts. Although the word 'suit' is not defined in the . . . policy, the usage of the word is clear and unambiguous. Thus, the word must be given its plain and ordinary meaning. In common usage, the word 'suit' refers to a proceeding in a court of law. Lay dictionaries define 'suit' in reference to court proceedings. . . . In conversations, the word 'suit' is used to connote an attempt to gain the resolution of an issue within the court system. The primary attribute of a suit is that the parties to the action are involved in actual court proceedings. Thus, before Lapham-Hickey can claim that Protection has breached its duty to defend, a suit must have been filed against Lapham-Hickey. Since nothing has been filed against Lapham-Hickey in a court of law, there is no 'suit' against which Protection can defend. [¶] . . .

"That the word 'suit' refers to a proceeding in a court of law is also apparent by looking at the Protection policy itself. If all of the policy's language is to be given effect, then the words 'suit' and 'claim' as used within [the policy] must have different meanings [because the] court must strive to give every term meaning unless to do so would render the term

*See Reporter's Note on page 1207.

inconsistent or contradictory[.] While Protection has the power to investigate any claim, it has the duty to defend only suits. If the word 'suit' was broadened to include claims, in the face of policy language which distinguishes between the two, any distinction between these two words would become superfluous. . . . The distinction the policy draws between suits and claims must be respected." (*Lapham-Hickey Steel* v. *Protection Mut. Ins.*, *supra*, 655 N.E.2d at pp. 847-848.)

—*City of Edgerton* v. *General Cas. Co.*, *supra*, 517 N.W.2d 463, held that letters from Wisconsin's Department of Natural Resources notifying Edgerton that it was a PRP under the state's equivalent of CERCLA and requesting Edgerton's participation in the remediation of a contaminated site did not constitute a "suit seeking damages" within the plain meaning of the insurance policies and thus did not trigger General Casualty's duty to defend. (*Id.* at p. 468.) This is the way the Wisconsin Supreme Court saw it: "[The demand letters do not have] the attributes of a 'suit.' . . . '[A] claim for damages made against [the insured] that *might* result in its legal liability is not synonymous with a "suit" so as to trigger [the insurer's] duty to defend . . . .'

"We find no ambiguity in the term 'suit' as it has been used in the insurance policies. 'Suit' denotes court proceedings, not a 'functional equivalent.'. . . *[T]he word 'suit' is easily understood and unambiguous to a reasonable policyholder. The proof is in the decisions that hold that a 'PRP letter' is the 'functional equivalent of a suit.' Either there is a suit or there is not. When there is no suit, there is no duty to defend. . . . '[T]o determine whether a duty to defend exists, the . . . insurer need only look at the allegations within the four corners of the complaint . . . .' . . . [¶] Construing . . . the EPA's PRP letter . . . as the 'functional equivalent of a suit' would be contrary to present Wisconsin insurance law since (a) the insurer would have to look beyond the four corners of the complaint in order to assess whether a potentially covered claim exists, and (b) the insurer would be put in the position of anticipating a coverage expectation for which it did not contract or receive payment. In this case, no complaint has been filed . . . . Therefore, no matter how coercive the language of the . . . letter was considered to be, it was used within the realm of an administrative proceeding. It did not have the effect of initiating a suit.*" (*City of Edgerton* v. *General Cas. Co.*, *supra*, 517 N.W.2d at pp. 474, 477, most italics added.)

—*Ray Industries, Inc.* v. *Liberty Mut. Ins. Co.*, *supra*, 974 F.2d 754, held that the EPA's PRP notice to Ray Industries was not a suit within the meaning of the policy and that, therefore, Liberty Mutual's duty to defend was not triggered. (*Id.* at p. 764.) This is how the Sixth Circuit viewed the

policy language under Michigan law: "In reaching [the] conclusion [that a PRP letter does not trigger the duty to defend], we rely upon the well-recognized principle that '[i]f the terms of [an insurance] contract are plain and unambiguous, their plain meaning should be given effect.' . . . We believe that 'suit' has a plain and unambiguous meaning that excludes the PRP letter in this case. In common usage, a suit generally involves an adjudicatory proceeding in a court of law. . . .

"These definitions strike us as clear and straightforward: a 'suit,' as that term is used both in conversation and in dictionaries, is an attempt to gain an object *in the courts.* The term refers to formal legal proceedings, as opposed to demands and other tactics that, however powerful, are not enforced by a court of law. We reject any attempt to allow phrases that appear in the definitions of 'suit,' such as 'legal process,' to expand this term beyond its traditional meaning to include a plethora of quasi-judicial actions from administrative orders to bureaucratic regulations. In recent years, the lines between the branches of government have become blurred; numerous executive and legislative agencies, along with certain private actors such as arbitrators, now have some form of adjudicative power. Rather than expanding the definition of 'suit,' however, we believe that this development highlights the term's traditional meaning, as it generally refers only to those proceedings that take place in a court of law, as opposed to other means of adjudication. . . .

"Furthermore, the policies in question distinguished between a 'suit' and a 'claim' in several places. . . . Ray's reading ignores this fact and renders the distinction between 'claim' and 'suit' superfluous.

"However, under Michigan law, we must construe the policy in such a manner as to give meaning to the distinction between claims and suits [and to] '. . . give effect to all words in an insurance contract if they serve a reasonable purpose.' . . .

". . . We must construe the policies as they were written, and give each party exactly what it contracted for. By limiting its duty to defend to 'suits,' Liberty unambiguously demonstrated its intention to avoid responsibility for any action that fell outside the traditional and well-recognized meaning of that term. This court will not deprive Liberty of the benefit of its bargain by forcing it to insure against the creation of a new type of legal action, a risk for which it was not paid." (*Ray Industries, Inc.* v. *Liberty Mut. Ins. Co.,* *supra,* 974 F.2d at pp. 761-764.)

—*Aetna Cas. and Sur. Co.* v. *General Dynamics Corp.* (8th Cir. 1992) 968 F.2d 707, held that letters from the EPA demanding General Dynamics'

participation in cleanup measures and negotiations and threatening "further appropriate response actions, including possible civil actions," were *not* suits and that Aetna thus was not obligated to provide a defense. (*Id.* at p. 713.) This is the way the Eighth Circuit viewed the language now before us: "We believe that a reading of the CGL language in context militates in favor of Aetna's position. The CGL language imposes upon Aetna a duty to 'defend any suit . . . seeking damages.' *Missouri law, in turn, requires us to give the terms of an insurance contract their plain and ordinary meaning. . . .*" (*Id.* at pp. 713-714, italics added.)

—*Harleysville Mut. Ins.* v. *Sussex County, Del.* (D.Del. 1993) 831 F.Supp. 1111, held that PRP notices from the EPA to the county about one of its landfills were not "suits" and that, therefore, the insurers had no duty to defend the county. (*Id.* at p. 1131.) This is what the Delaware District Court had to say about the language now before us: "[T]he Court finds for the following reasons that the PRP letters . . . do not constitute a 'suit' and, therefore, the insurers do not have a duty to defend the County against the CERCLA proceeding brought by the EPA to investigate and control the release . . . of hazardous substances . . . at [the] Landfill . . . .

"First, Delaware courts should not destroy or twist the meaning of words under the guise of construing them. . . . In light of this principle, the Court agrees [that there is] no ambiguity in the word 'suit' and conclude[s] that it could not construe the EPA's threat to hold the insured liable for clean up costs as a suit without doing violence to the plain and ordinary meaning of the word. . . . The Court is mindful of the serious nature of the letters from the EPA . . . . However, the insurance policies at issue in this case limit the insurers['] duty to defend to 'suits' and the Court will not deprive the insurers of the benefit of their bargain by forcing them to defend against an administrative proceeding, no matter how serious the consequences of that proceeding might be to the insured.

"Second, the Court finds that recognizing the distinction between a 'suit' and other agency action taken against an insured follows the options available to the EPA under CERCLA. Pursuant to Sections 104, 106 and 107 of CERCLA, 42 U.S.C. §§ 9604, 9606 and 9607, the EPA can file a lawsuit against a PRP as it [has done in other cases], or it can contact the PRP and try to secure its voluntary cooperation as it did in this case. Recognizing the difference in these approaches provides a clear line of demarcation between situations that do and do not trigger the insurer's duty to defend. . . ."

(*Harleysville Mut. Ins.* v. *Sussex County, Del.*, *supra*, 831 F.Supp. at pp. 1131-1132.)[9]

## III.

### *Conclusion*

 We find no ambiguity in the Fireman's Fund policy's distinction between a "suit" and a "claim" and we therefore interpret the word "suit" according to its plain and ordinary meaning—as an action or proceeding pursued in a court of law. It follows that, however draconian or coercive the remedies sought may be, administrative actions by the EPA and the RWQCB are not "suits." Since no suit has been filed against Vickers, Fireman's Fund's duty to provide a defense has not been triggered.

### DISPOSITION

Let a peremptory writ of mandate issue commanding the trial court (1) to vacate the order granting Vickers' motion for summary adjudication of Fireman's Fund's duty to defend and (2) to enter a new order denying that motion. The parties are to pay their own costs of these writ proceedings.

Ortega, J., concurred.

**SPENCER, P. J.,** Concurring.—I agree Fireman's Fund had no duty to defend, in that the Environmental protection Agency's (EPA) orders did not emanate from a suit. I do not agree, however, that the definition of "suit" is limited to proceedings in a court of law tried by a judge or jury. As noted in Webster's Third New International Dictionary (1993) page 2286, column 3, "suit" is not only "an action or process in a court for the recovery of a right or claim," but it may include "the attempt to gain an end by legal process," or "prosecution of [a] right *before any tribunal*." (Italics added.) While a court undoubtedly is a tribunal, additionally a tribunal is a "forum of justice"

---

[9]See also *Joslyn Mfg. Co.* v. *Liberty Mut. Ins. Co.* (W.D.La. 1993) 836 F.Supp. 1273, 1278 (refusing to treat letter from the state's Department of Environmental Quality as a "suit" and observing that " '[w]ords are not pebbles in alien juxtaposition; they have only a communal existence; and not only does the meaning of each interpenetrate the other, but all in their aggregate take their purport from the setting in which they are used' "); *Metro Wastewater Reclamation* v. *Continental Cas.* (D.Colo. 1993) 834 F.Supp. 1254, 1256-1258; *Mich. Millers Mut. Ins.* v. *Bronson Plat.*, *supra*, 519 N.W.2d at p. 875 (dis. opn. of Griffin, J.) ("The mere assertion of doubtful meaning does not give rise to an ambiguity, and a court is not at liberty to create ambiguity in a contract where none exists"); *Patrons Oxford Mut. Ins. Co.* v. *Marois*, *supra*, 573 A.2d at p. 20; *Maryland Cas. Co.* v. *Armco, Inc.* (4th Cir. 1987) 822 F.2d 1348, 1354; *Arco* v. *Travelers Ins. Co.* (W.D.Mich. 1989) 730 F.Supp. 59, 68; *Harter Corp.* v. *Home Indem. Co.* (W.D.Mich. 1989) 713 F.Supp. 231, 232-233.

and may consist of any "person or body of persons having authority to hear and decide disputes so as to bind the disputants" or who "decides or judges" a matter and "determines or directs a judgment or course of action." (*Id.* at p. 2441, col. 1.) In my view, therefore, the common, ordinary meaning of "suit" is broad enough to cover alternative dispute resolution proceedings such as adjudicatory administrative hearings without resort to the "functional equivalent" approach to contract interpretation (*Mich. Millers Mut. Ins.* v. *Bronson Plat.* (1994) 445 Mich. 558 [519 N.W.2d 864, 868, 870]).

What the EPA conducted here was merely an *investigative* administrative proceeding seeking a negotiated settlement and a consent decree. As the agency lacked the requisite authority to bind the disputants, even under the "functional equivalent" approach to interpretation, this proceeding did not qualify as a suit. I therefore concur in the judgment.