128 Cal.Rptr.2d 827 (2002)
104 Cal.App.4th 957
POWERINE OIL COMPANY, Inc., Petitioner,
v.
The SUPERIOR COURT of Los Angeles County, Respondent,
Central National Insurance Company of Omaha, et al., Real Parties in Interest.
No. B156216.
Court of Appeal, Second District, Division Three.
December 23, 2002.
Rehearing Denied January 17, 2003.
Review Denied March 19, 2003.
*829 Heller, Ehrman, White & McAuliffe, David B. Goodwin and Esta L. Brand, San Francisco; Isola & Bowers, David R. Isola and Aaron L. Bowers, Acampo, for Petitioner.
No appearance for Respondent.
O'Melveny & Myers, Richard B. Goetz, Los Angeles, Martin S. Checov, San Francisco, Carlos E. Needham and Eric Y. Kizirian, Los Angeles; Berman & Aiwasian and Ray Tamaddon for Real Party in Interest Central National Insurance Company of Omaha.
Hancock, Rothert & Bunshoft, William J. Baron, and Kathryn C. Ashton, San Francisco, and Patrick A. Cathcart, Los Angeles, for London Market Insurers as Amicus Curiae on behalf of Real Party in Interest.
Wiley, Rein & Fielding, Laura A. Foggan and John C. Yang; Sinnott, Dito, Moura & Puebla, Randolph P. Sinnott and John J. Moura, Los Angeles, for Complex Insurance Claims Litigation Association as *830 Amicus Curiae on behalf of Real Party in Interest.
No appearance by Real Parties in Interest Century Indemnity Company, ACE Property and Casualty Company, and Pacific Employers Insurance Company.
*828 ALDRICH, J.

INTRODUCTION
In this writ proceeding, we hold the indemnification language in nine excess/umbrella liability policies obligates the insurer Central National Insurance Company of Omaha (Central National) to indemnify its insured Powerine Oil Company, Inc. (Powerine) for expenses Powerine incurs in responding to two orders issued by the California Regional Water Quality Control Board (the Water Quality Board) to clean up and abate contamination originating from Powerine's subsidiary. In reaching our decision, we distinguish the language of the instant excess/umbrella policies from that contained in the standard comprehensive general liability (CGL) policies, which latter policies were the subject of prior decisions of our Supreme Court: Certain Underwriters at Lloyd's of London v. Superior Court (Powerine Oil Company) (2001) 24 Cal.4th 945, 103 Cal.Rptr.2d 672, 16 P.3d 94 (hereinafter Powerine I), and Foster-Gardner, Inc. v. National Union Fire Ins. Co. (1998) 18 Cal.4th 857, 77 Cal.Rptr.2d 107, 959 P.2d 265 (hereinafter Foster-Gardner).
This proceeding comes on the heels of the earlier writ proceeding in the same case (Powerine I) in which the Supreme Court held that "damages" in the indemnification wording of the standard CGL policy means only money ordered by a court, and not the cost to comply with administrative agency environmental orders. In granting summary adjudication below, the trial court perceived itself constrained by Powerine I to construe the Central National excess/umbrella insurance policies as denying coverage to Powerine for sums Powerine spends pursuant to the cleanup and abatement orders issued by the Water Quality Board. Distinguishing the language of its excess/umbrella policies under consideration here from that before the court in Powerine I, Powerine seeks a writ of mandate directing the trial court to vacate its order granting summary adjudication in favor of real party in interest, cross-defendant Central National. We hold the specific indemnification language in the Central National excess/umbrella policies here is broader in scope than that contained in the CGL policies in Powerine I and Foster-Gardner and includes the costs Powerine expends in responding to administrative agencies' cleanup and abatement orders. Accordingly, we grant the petition and issue the writ.

FACTUAL AND PROCEDURAL BACKGROUND
The parties have stipulated to the following facts: Powerine, through its various owners, has been engaged in oil refinery operations in Southern California periodically since the mid-1930's. As a result of its operations, Powerine faces certain governmentally-imposed environmental liabilities arising from alleged soil and ground-water contamination at various locations. Two regional offices of the Water Quality Board issued two orders to Powerine to clean up and abate alleged pollution at 10 locations. These cleanup and abatement orders were not issued as a result of litigation or as part of an injunction.
Cleanup and abatement order 97-118 issued by the Los Angeles region of the Water Quality Board, we are told, followed intensive negotiations and a series of compromises between Powerine and the Water Quality Board concerning the scope of the order and the nature and extent of investigative activities to be undertaken thereunder. Nonetheless, as of the date of these *831 proceedings, Powerine had not incurred any expenses pursuant to the orders.
Powerine notified its many insurers of the orders, giving rise to a declaratory relief action against it. (Highlands Insurance Company v. Powerine, etc., et al, L.A.S.C. case No. VC025771.) Powerine cross-complained against numerous insurers, including real-party-in-interest Central National,[1] alleging the insurers had a contractual duty to defend and indemnify Powerine for various claims and losses arising from the environmental orders issued by the Water Quality Board, and requesting, inter alia, declaratory relief and damages for breach of contract and of the covenant of good faith and fair dealing.
The lawsuit before us involves nine excess/umbrella liability policies Central National issued to Powerine, commencing in 1973.[2] The last of the policies expired in February 1983. The meaning of the indemnification provision in these nine policies is the subject of this proceeding.[3]
The pertinent coverage language in these nine Central National excess/umbrella policies reads in relevant part: "The Company hereby agrees ... to indemnify the Insured for all sums which the Insured shall be obligated to pay by reason of the liability ... imposed upon the Insured by law ... for damages, direct or consequential and expenses, all as more fully defined by the term `ultimate net loss' on account of: ... property damage ... caused by or arising out of each occurrence happening anywhere in the world." (Italics added.)
"Ultimate net loss" is defined as "the total sum which the Insured or any company as his insurer, or both, become obligated to pay by reason of ... property damage ... either through adjudication or compromise ... and for litigation, settlement, adjustment and investigation of claims and suits which, are paid as a consequence of any occurrence covered hereunder...." (Italics added.)
While the lawsuit was pending, the Supreme Court decided Foster-Gardner. Thereafter, a writ proceeding in this action brought by the primary insurers culminated in the Supreme Court's Powerine I decision holding the word "damages," in the indemnification language of the standard CGL policies, means only those sums ordered by a court of law.
After Powerine I was decided, Central National moved for summary adjudication, *832 which resulted in the judgment giving rise to this writ proceeding. In its motion, Central National sought an order that pursuant to Powerine I in particular, and also Foster-Gardner, it has no duty to indemnify Powerine under its excess/umbrella policies for any sums spent by Powerine pursuant to the Water Quality Board's cleanup and abatement orders because no "damages" within the meaning of those policies had been ordered by a court. Premised on the stipulation of material facts,[4] the motion addressed a matter of law only.
The trial court granted Central National's summary adjudication motion. Pursuant to Powerine I, the trial court ruled Central National has no duty to indemnify Powerine under its various policies for sums Powerine spends pursuant to the cleanup and abatement orders issued by the Water Quality Board. The trial court explained the Central National policies' definition of coverage for "damages" did not include cleanup and abatement expenses ordered outside the context of a lawsuit. The trial court rejected Powerine's argument based on the difference in purpose between its excess/umbrella policies and the CGL policies in Powerine I. The court explained it could not apply a meaning to "damages" which changes depending on the type of policy in effect. The instant proceeding ensued.

CONTENTIONS
Powerine contends Powerine I and Foster-Gardner are not controlling because (1) the language of the Central National policies is broader than that considered in Powerine I; and (2) the policy at issue here is not a standard CGL policy, but an excess/umbrella policy.

DISCUSSION

1. Standard of review.

"[S]ummary judgment [is] granted [when] there is no triable issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subds. (c) & (f).)
On appeal, we review de novo the trial court's order granting summary adjudication, applying the rules governing interpretation of insurance contracts set out below. (Maxconn Inc. v. Truck Ins. Exchange (1999) 74 Cal.App.4th 1267, 1272, 88 Cal.Rptr.2d 750.) The case was presented to the trial court upon stipulated facts and so the issue both before it and before this Court is one of pure law, namely, the interpretation of the language contained in Central National's excess/umbrella policies where the promise to indemnify is set forth. (Waller v. Truck Ins. Exchange, Inc. (1995) 11 Cal.4th 1, 18, 44 Cal.Rptr.2d 370, 900 P.2d 619.)

2. Rules of policy interpretation; Foster-Gardner and Powerine I.

The rules of policy interpretation have been well established by our Supreme Court: "`While insurance contracts have special features, they are still contracts to which the ordinary rules of contractual interpretation apply.' [Citations.] `The fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties.' [Citation.] `Such intent is to be inferred, if possible, solely from the written provisions of the contract.' [Citation.] `If contractual language is clear and explicit, it governs.' [Citation.]" (Foster-Gardner, supra, 18 Cal.4th at p. 868, 77 Cal.Rptr.2d 107, 959 P.2d 265.)
*833 Thus, "`[a] policy provision will be considered ambiguous when it is capable of two or more constructions, both of which are reasonable.' [Citations.] The fact that a term is not defined in the policies does not make it ambiguous. [Citations.] Nor does `[disagreement concerning the meaning of a phrase,' or `"the fact that a word or phrase isolated from its context is susceptible of more than one meaning."' [Citation.] `"[L]anguage in a contract must be construed in the context of that instrument as a whole, and in the circumstances of that case, and cannot be found to be ambiguous in the abstract."' [Citation.] `If an asserted ambiguity is not eliminated by the language and context of the policy, courts then invoke the principle that ambiguities are generally construed against the party who caused the uncertainty to exist (i.e., the insurer) in order to protect the insured's reasonable expectation of coverage.' [Citation.]" (Foster-Gardner, supra, 18 Cal.4th at p. 868, 77 Cal.Rptr.2d 107, 959 P.2d 265.)

3. Supreme Court precedent.

As Foster-Gardner, and especially Powerine I, shape and influence our decision here, we begin our analysis by reviewing those decisions.

A. The Foster-Gardner decision.

At issue in Foster-Gardner was the language in the standard CGL insurance policy establishing the duty to defend. The policy stated, "`the company shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury or property damage, ... and may make such investigation and settlement of any claim or suit as it deems expedient....'" (Foster-Gardner, supra, 18 Cal.4th at p. 863, 77 Cal.Rptr.2d 107, 959 P.2d 265, italics added.)
Taking a "`literal' approach" to interpreting the meaning of the word "suit" in the duty to defend clause, the Supreme Court concluded "suit" was not ambiguous and denoted only a court proceeding initiated by the filing of a complaint. (Foster-Gardner, supra, 18 Cal.4th at pp. 869, 871-872, 879, 887, 77 Cal.Rptr.2d 107, 959 P.2d 265.) Based on this policy language, the Supreme Court held the insurer's duty to defend the insured in a "suit" was limited to a civil action prosecuted in a court; it did not extend to an order issued by an administrative agency under an environmental statute. (Powerine I, supra, 24 Cal.4th at p. 960, 103 Cal.Rptr.2d 672, 16 P.3d 94, citing Foster-Gardner, supra, at pp. 878-888, 77 Cal.Rptr.2d 107, 959 P.2d 265.) Under the policies in Foster-Gardner, an insurer was required to defend a suit, but had discretion to investigate and settle a claim. (Foster-Gardner, supra, at p. 878, 77 Cal.Rptr.2d 107, 959 P.2d 265.) Noting the juxtaposition, the Supreme Court explained, an administrative proceeding under environmental statutes "does not constitute a `suit,' i.e., a civil action prosecuted in a court, but rather implicates a 'claim.' [Citation.]" (Italics added, Powerine I, supra, at p. 960, 103 Cal.Rptr.2d 672, 16 P.3d 94, citing Foster-Gardner, supra, at pp. 878-888, 77 Cal. Rptr.2d 107, 959 P.2d 265.)
This holding was intended to "create[ ] a `bright-line rule that, by clearly delineating the scope of risk, reduce[d] the need for future litigation," by avoiding the "`case-by-case determination whether each new and different letter presenting the claim of an administrative agency is to be deemed the "functional equivalent of a suit brought in a court of law."` [Citation.]" (Foster-Gardner, supra, 18 Cal.4th at pp. 887-388, 77 Cal.Rptr.2d 107, 959 P.2d 265, original italics.) For our purposes, among the distinctions established by the Supreme Court in Foster-Gardner was the contrast *834 between, on the one hand a "suit," i.e., a civil action in a court commenced by a complaint, and on the other hand a "claim," which can be initiated by an administrative proceeding. (See id. at p. 879, 77 Cal.Rptr.2d 107, 959 P.2d 265.)

B. The Powerine I decision.

The earlier writ proceeding in this case, Powerine I, involved interpretation of the word "damages" in the indemnification provision of the primary CGL insurance policies issued to Powerine by Certain Underwriters at Lloyd's, London and Certain London Market Insurance Companies. Powerine I was triggered by the same cleanup and abatement orders and the same complaint brought by Highlands Insurance Company as here. (Powerine I, supra, 24 Cal.4th at pp. 951-952, 103 Cal. Rptr.2d 672, 16 P.3d 94.) While Foster-Gardner addressed the scope of the duty to defend, Powerine I considered the reach of the duty to indemnify.
Specifically limiting its analysis to the standard CGL insurance policy (Powerine I, supra, 24 Cal.4th at p. 950, 103 Cal. Rptr.2d 672, 16 P.3d 94), the Supreme Court in Powerine I held "the insurer's duty to indemnify the insured for 'all sums that the insured becomes legally obligated to pay as damages' under the standard CGL insurance policy is limited to money ordered by a court." (Id at pp. 960, 964, 103 Cal.Rptr.2d 672, 16 P.3d 94, italics added.)
This holding flowed directly from the so-called Foster-Gardner "syllogism" (Powerine I, supra, 24 Cal.4th at p. 960, 103 Cal.Rptr.2d 672, 16 P.3d 94), which states: "The duty to defend is broader than the duty to indemnify. The duty to defend is not broad enough to extend beyond a `suit,' i.e., a civil action prosecuted in a court, but rather is limited thereto. A fortiori, the duty to indemnify is not broad enough to extend beyond `damages,' i.e., money ordered by a court, but rather is limited thereto." (Id. at p. 961, 103 Cal.Rptr.2d 672,16 P.3d 94.)
The Powerine I Court further explained the term "damages" in its "full context" and in its "`ordinary and popular sense'" is limited to "money ordered by a court" because the provision that imposes the duty to defend "links `damages' to a `suit,' i.e., a civil action prosecuted in a court" (Powerine I, supra, 24 Cal.4th at pp. 961-962, 969, 103 Cal.Rptr.2d 672, 16 P.3d 94), and because "in both the legal and the broader culture, `damages' exist traditionally inside of court." (Id. at p. 969, 103 Cal.Rptr.2d 672, 16 P.3d 94.) That is, the Court elucidated, "`[d]amages' do not constitute a redundancy to a `sum that the insured becomes legally obligated to pay,' but a limitation thereof." (Id, at p. 963, 103 Cal.Rptr.2d 672, 16 P.3d 94.) This limitation, the Supreme Court reasoned, "commends itself to society generally as laying down a bright-line rule," having "a tendency to promote fairness and efficiency in the judicial sphere." (Id. at pp. 965-966,103 Cal.Rptr.2d 672,16 P.3d 94.)
In reaching its decision, the Powerine I Court distinguished between the word "damages," present in the CGL policy, and the term "expenses," ordered by an administrative agency, which latter word did not appear in the analyzed indemnity provision. The duty to indemnify for "damages " in the primary policies, the Supreme Court stated, did "not extend to any expenses required by an administrative agency pursuant to an environmental statutespecifically, here, proceedings conducted before the Regional Water Boards ...." (Powerine I, supra, 2A Cal.4th at p. 966, 103 Cal.Rptr.2d 672, 16 P.3d 94, italics added.) The reason, the Supreme Court explained, is that "expenses required by an administrative agency *835 pursuant to an environmental statute, whether for the cleanup of a contaminated site and the abatement of the contamination's effects or otherwise, do not constitute money ordered by a court." (Id. at pp. 966, 969-971, 974, 103 Cal.Rptr.2d 672, 16 P.3d 94, italics added.)
Read together, Foster-Gardner and Powerine I stand for the proposition that the duty to defend a "suit" seeking "damages" under the standard CGL policies is restricted to civil actions prosecuted in a court, initiated by the filing of a complaint, and does not include claims, which can denote proceedings conducted by administrative agencies under environmental statutes. Likewise, the duty to indemnify for "`all sums that the insured becomes legally obligated to pay as damages'" (Powerine I, supra, 24 Cal.4th at p. 961, 103 Cal.Rptr.2d 672, 16 P.3d 94, italics added) in the same standard primary policies is limited to money ordered by a court, and does not include expenses such as may be incurred in responding to administrative agency orders.
With the above-delineated rules and authorities in mind, we turn to the language at hand.

4. The coverage and ultimate net loss provisions encompass costs incurred in complying with administrative agency environmental orders where no lawsuit is filed.

We are confronted here with the next dispute to ensue from the cleanup and abatement orders issued to Powerine by the Water Quality Board, namely whether the words of the excess/umbrella insurance policy impose on the insurer a duty to indemnify the insured for the costs incurred to negotiate and comply with administrative-agency environmental orders. While the issue is rather clear-cut, it bears repeating that we are analyzing the language of excess/umbrella policies, not the CGL policies that were at issue in Foster-Gardner and Powerine I.
Turning to the specific language under consideration here, as noted, the coverage provision of the Central National policies states: Central National "agrees ... to indemnify the Insured for all sums which the Insured shall be obligated to pay by reason of the liability ... imposed upon the Insured by law ... for damages ... and expenses, all as more fully defined by the term `ultimate net loss' on account of: ... property damage." (Italics added.)
Ultimate net loss is defined as "the total sum which the Insured, ... become[s] obligated to pay by reason of ... property damage ... either through adjudication or compromise, and shall also include ... law costs ... for litigation, settlement, adjustment and investigation of claims and suits which, are paid as a consequence of any occurrence covered hereunder...."
"The `clear and explicit' meaning of the [policy] provisions, interpreted in their `ordinary and popular sense,' controls judicial interpretation unless `used by the parties in a technical sense or a special meaning is given to them by usage.' [Citation.]" (Vandenberg v. Superior Court (1999) 21 Cal.4th 815, 839-840, 88 Cal.Rptr.2d 366, 982 P.2d 229.) We conclude coverage is unambiguous and clearly extends beyond money ordered by a court.
The terms "obligated to pay by reason of the liability ... imposed upon the Insured by law" as appears here, and "legally obligated to pay" as appears in the insuring clause of the standard CGL policy analyzed by Powerine I, are considered to have the same import. (International Surplus Lines Ins. Co. v. Devonshire Coverage Corp. (1979) 93 Cal.App.3d 601, 611, 155 Cal.Rptr. 870, disapproved on other grounds in Vandenberg v. Superior Court, *836 supra, 21 Cal.4th 815, 839-841, 88 Cal. Rptr.2d 366, 982 P.2d 229; see also AIU Ins. Co. v. Superior Court (1990) 51 Cal.3d 807, 814-815, 274 Cal.Rptr. 820, 799 P.2d 1253 ["legally obligated" and "obligated ... by law" treated as similar].) The phrases connote a legal obligation in the abstract or simpliciter[5] (Powerine I, supra, 24 Cal.4th at p. 963, 103 Cal.Rptr.2d 672, 16 P.3d 94.) It is the addition of the words "as damages" that limits the legal obligation to sums ordered by a court. (Ibid.)
However, unlike the general liability policies at issue in Powerine I, the coverage provision here does not leave the word "damages" alone, but adds the term "expenses." "The use of both terms raises the inference that they were not intended to be synonymous." (Reserve Insurance Co. v. Pisciotta (1982) 30 Cal.3d 800, 811, 180 Cal.Rptr. 628, 640 P.2d 764.) By supplementing "damages" with "expenses," the umbrella policies have created a category of indemnifiable costs separate and independent from "damages" and has thus extended its coverage beyond the limitation imposed were the term "damages" used alone. Both literally and in its most ordinary and popular sense, the term "expenses" is other than "damages" (see Powerine I, supra, 24 Cal.4th at pp. 966, 969-971, 974, 103 Cal.Rptr.2d 672, 16 P.3d 94), and where it is a supplemental term in these Central National policies, its addition enlarges the scope of coverage beyond the "money ordered by a court" declared in Powerine I.
In addition to including the term "expenses" to broaden the coverage beyond that provided by the word "damages," the Central National coverage provision defines both "damages" and "expenses" by reference to "ultimate net loss." In turn, "ultimate net loss" is described as the total sum which Powerine becomes "obligated to pay by reason of ... property damage ... either through adjudication or compromise ...." (Italics added.) While "adjudication" implies a proceeding in a court, "compromise," which the policy distinguishes from "adjudication" (Reserve Insurance Co. v. Pisciotta, supra, 30 Cal.3d at p. 811, 180 Cal.Rptr. 628, 640 P.2d 764), does not necessarily implicate a suit commenced by filing a complaint. A compromise may be reached before a complaint is ever filed. Nor must a "compromise" be judicially approved. Notably lacking from the policy language are words such as "judicially approved," "judicially sanctioned," or "judicially ordered" compromise. In its "`ordinary and popular sense'" (Civ.Code, § 1644; Powerine I, supra, 24 Cal.4th at p. 969, 103 Cal. Rptr.2d 672, 16 P.3d 94), a compromise is "a settlement by arbitration or by consent reached by mutual concessions" (Webster's 3d New Internat. Diet. (1971) p. 467, col. 3, italics added); it is not necessarily the end result of litigation. A compromise may be reached in order to avert a lawsuit altogether. Indeed, here we are told that the content of at least one cleanup and abatement order was the result of intensive *837 negotiation between the Water Quality Board and attorneys for Powerine without resorting to the courts. As one order is the result of a compromise, our conclusion the cleanup orders would necessarily fall within the ambit of the Central National policies' coverage provision would comport with the objectively reasonable expectations of the insured. (Bank of the West v. Superior Court (1992) 2 Cal.4th 1254,1265, 10 Cal.Rptr.2d 538, 833 P.2d 545.)
Moreover, the definition of "ultimate net loss" employs both the term "suits" and the word "claims." A "claim" is not a "suit." (Foster-Gardner, supra, 18 Cal.4th at pp. 878-879, 880, 77 Cal. Rptr.2d 107, 959 P.2d 265.) Whereas the "`[t]erm "suit" has generally been replaced by [the] term "action," which includes both actions at law and in equity[,]'" a "claim" the Supreme Court in Foster-Gardner explained, "`can be any number of things, none of which rise to the formal level of a suit.... While a claim may ultimately ripen into a suit, "claim" and "suit" are not synonymous.' [Citations.]" (Foster-Gardner, supra, at p. 879, 77 Cal.Rptr.2d 107, 959 P.2d 265, italics added, quoting from Fireman's Fund Ins. Co. v. Superior Court (1997) 65 Cal.App.4th 1205, 1216, 78 Cal.Rptr.2d 418; Powerine I, supra, 24 Cal.4th at p. 960, 103 Cal.Rptr.2d 672, 16 P.3d 94.) Rather, a "claim," included here in the definition of ultimate net loss, can be "`the document used to initiate a wide variety of administrative proceedings.... ` [Citations.]" (Foster-Gardner, supra, at p. 879, 77 Cal.Rptr.2d 107, 959 P.2d 265, italics added, quoting from Fireman's Fund. Ins. Co. v. Superior Court, supra, 65 Cal. App.4th at p. 1216, 78 Cal.Rptr.2d 418.) Here the excess/umbrella policies' definition of damages and expenses includes costs of "litigation, settlement, adjustment and investigation of claims and suits...." (Italics added.) Manifestly, coverage encompasses the expenses of "suits," i.e., the expenditures of litigating an action brought in court, as well as the costs of "claims," i.e., other activities that are not tantamount to litigation. (Foster-Gardner, supra, at p. 879, 77 Cal.Rptr.2d 107, 959 P.2d 265; Powerine I, supra, at p. 960, 103 Cal.Rptr.2d 672, 16 P.3d 94.)
The trial court below found the term "expenses" was "intended to be those which arise in the course of that adjudication or compromise." It believed to interpret "expenses" to mean more would be to read into the contract three separate methods of determining "expenses": adjudication, compromise, and administrative action, while the policies only explicitly state the first two. However, we think the trial court artificially limited the meaning of "expenses." In addition to sums fixed by adjudication, "expenses" includes money determined by compromise, and includes adjustment costs and other expenses to investigate "claims" and "suits." The only limit on the meaning of "expenses" in the policies' definition of ultimate net loss is the requirement that they be "paid as a consequence of any occurrence covered hereunder [under the policy]" i.e., resolved by "adjudication or settlement." (Italics added.) Referring to the insuring clause, because it identified all these categories of costs separately, the insured would reasonably understand that all of these categories of costs would be covered.[6]
*838 Not only is the insuring clause made more expansive than merely money ordered by a court by virtue of its use of more types of losses, but consider also that the ultimate net loss provision contains a laundry list of costs joined together by phrases such as "and shall also include," "and all sums." That list includes "expenses for doctors, lawyers, nurses and investigators and other persons, and for litigation, settlement, adjustment and investigation of claims and suits...." Such list looks very much like the site investigation and cleanup expenses which may be characterized as environmental response costs. (See Aerojet-General Corp. v. Transport Indemnity Co. (1997) 17 Cal.4th 38, 47, fn. 2, 58, 70 Cal.Rptr.2d 118, 948 P.2d 909 [establishing when site investigation expenses are defense costs].) Where these words are utilized in the ultimate net loss provision, which itself is used to define the scope of coverage, then the costs of investigation, monitoring, and adjusting environmental agency cleanup and abatement orders would fall within the ambit of the policies' coverage.
Indeed, the Powerine I Court contrasted the terms "damages" and "expenses," referring to the latter as those costs "required by an administrative agency pursuant to an environmental statute" for cleanup of a contaminated site. (Powerine I, supra, 24 Cal.4th at pp. 966, 969-971, 974, 103 Cal.Rptr.2d 672, 16 P.3d 94.) Also, costs incurred in remediation or abatement, but not prevention, of environmental pollution in response to a court order are "sums the insured is legally obligated to pay as damages" (AIU Ins. Co. v. Superior Court, supra, 51 Cal.3d at pp. 818, 825-829, 842-843, 274 Cal.Rptr. 820, 799 P.2d 1253) where the costs arise "because of "property damage" within the meaning of the standard liability policy. (Id, at pp. 831, 842, 274 Cal.Rptr. 820, 799 P.2d 1253.) Costs incurred "because of "property damage" under a general liability policy will include injunctive relief and damages ordered by a court to clean up pollution. (Id. at pp. 842-843, 274 Cal. Rptr. 820, 799 P.2d 1253.) It follows therefore, that costs incurred because of property damage, under these Central National excess/umbrella policies, include "expenses " Powerine is "obligated to pay by reason of the liability ... imposed" by administrative-agency environmental cleanup and abatement orders outside of a lawsuit. (See id. at p. 818, 274 Cal.Rptr. 820, 799 P.2d 1253.) Certainly nothing in the ordinary meaning of the phrase "agrees ... to indemnify the Insured for all sums which the Insured shall be obligated to pay by reason of the liability ... imposed upon the Insured by law ... for damages ... and expenses ...." on account of or by reason of property damage excludes the expenses incurred in responding to and complying with administrative orders and regulations requiring it to clean up environmental pollution.
In sum, the straightforward and unambiguous meaning of the coverage provision here, with its attendant reference to ultimate net loss, interpreted in its ordinary and popular sense (Vandenberg v. Superior Court, supra, 21 Cal.4th at pp. 839-840, 88 Cal.Rptr.2d 366, 982 P.2d 229), expressly extends coverage beyond "damages" resulting from a lawsuit to embrace also those costs incurred in responding to administrative-agency orders requiring response, cleanup, and abatement of environmental pollution imposed outside the context of a lawsuit. The policies commit Central National to indemnify for "expenses" and "damages," which arise in the context of "adjudication" or "compromise," *839 and as "claims" and "suits," all of which have distinct meanings, and are not limited to money ordered by a court in a lawsuit. The care these policies took to list all of these different kinds of costs "indicates that the insurers' differing rights and obligations with respect to `suits' and `claims' [as well as "expenses" and "damages"] were deliberately and intentionally articulated in the policies. [Citation.]" (Foster-Gardner, supra, 18 Cal.4th at p. 880, 77 Cal.Rptr.2d 107, 959 P.2d 265.) Where cleanup and abatement costs are incurred "because of "property damage," they are thus covered occurrences under the policies. The purposeful inclusion of both the words "expenses" and "claims" indicates the discernible intent that the insurer be responsible in addition to the costs ordered by a court, for the costs incurred in responding to environmental orders initiated by administrative agencies. (See AIU Ins. Co. v. Superior Court, supra, 51 Cal.3d at p. 842, fn. 19, 274 Cal.Rptr. 820, 799 P.2d 1253; Croskey et al., Cal. Practice Guide: Insurance Litigation, supra, ¶ 8:78.5, p. 8-32.2.)
Central National, however, views the ultimate net loss provision as serving one purpose only, namely, to "burn limits" (Croskey et al., Cal. Practice Guide: Insurance Litigation (2002) ¶ 7:356, p. 790), whereby the indemnity limit is "reduced dollar for dollar by defense costs until zero is reached and the duty to indemnify and the duty to defend are then terminated [citation]." (Aerojet-General Corp. v. Transport Indent. Co., supra, 17 Cal.4th at p. 76, fn. 29, 70 Cal.Rptr.2d 118, 948 P.2d 909.) Central National and amici reason, where the ultimate net loss provision serves to consume indemnification limits, the clause cannot also be employed to expand coverage. But, these Central National policies lack a provision indicating the policies function as "self-consuming" or "burning limits" contracts. (See Croskey et al., Cal. Practice Guide: Insurance Litigation, supra, ¶ 7:357, p. 7A-90.) Had Central National wanted to include a burning limits clause, it knew how to do so. In any event, regardless of what other purposes the ultimate net loss clause serves in these contracts, the clause is also utilized by the insuring provision to "more fully define[]" coverage; its very words clearly define coverage more expansively than that set forth in the CGL policies scrutinized by Powerine I.
Our conclusion that the indemnity provision is more expansive than that in the standard primary policies by covering losses incurred in responding to administrative agency orders without resort to a lawsuit is reinforced by examining the indemnification language in context, with regard to the policy as a whole. (Powerine I, supra, 2A Cal.4th at p. 961, 103 Cal. Rptr.2d 672, 16 P.3d 94; Bank of the West v. Superior Court, supra, 2 Cal.4th at p. 1265, 10 Cal.Rptr.2d 538, 833 P.2d 545.) Central National's contention to the contrary notwithstanding, the policies at issue here are not solely intended to operate as excess insurance, i.e., following the form of the underlying policies adjudicated in Foster-Gardner and Powerine I. According to the actual policy language (Wells Fargo Bank v. California Ins. Guarantee Assn. (1995) 38 Cal.App.4th 936, 947-948, 45 Cal. Rptr.2d 537), Central National will also pay the excess of "the amount of ultimate net loss ... in respect of each occurrence not covered by said underlying insurances." (Italics added.) This limitation of liability provision allows the Central National policies to function also as an umbrella policy providing "alternative primary coverage as to losses `not covered by' the primary policy." (Reserve Insurance Co. v. Pisciotta, supra, 30 Cal.3d at p. 812, 180 Cal.Rptr. 628, 640 P.2d 764; Century Indemnity Co. v. London Under *840 writers (1993) 12 Cal.App.4th 1701, 1707, fn. 5, 16 Cal.Rptr.2d 393.) The umbrella language here may "`fill any gaps in coverage left open by the [underlying] coverage ...." (Croskey, et al., Cal. Practice Guide: Insurance Litigation, supra, at ¶ 8:84, p. 8-33), such as the gap created by the decision in Powerine I denying coverage under the primary policies for the costs of complying with administrative agency directives. The fact these Central National policies also provide umbrella indemnity tells us that the insured would have expected the policies to grant broader coverage than that provided by the primary insurance. (Century Indemnity Co. v. London Underwriters, supra, p. 1707, fn. 5, 16 Cal.Rptr.2d 393.) Our reading of the Central National insuring clause to be more expansive than the primary insurance in Powerine I gives effect to the mutual intent of the parties as evinced by the mechanism of umbrella insurance. (Bank of the West v. Superior Court, supra, at p. 1264, 10 Cal.Rptr.2d 538, 833 P.2d 545; Century Indemnity Co. v. London Underwriters, supra.)[7]
Central National characterizes the excess/umbrella policies here at issue as "materially identical" to and "fundamentally indistinguishable" in both language and function from the CGL policies at issue in Powerine I. Such an assertion ignores both the actual umbrella language of the policy and the purpose behind umbrella coverage. Along these lines, Central National and amici quote from the coverage provision only up to the word "damages." Based thereon, they insist because Powerine I held that "damages" means only money ordered by a court, that Powerine here is precluded by principles of law of the case and issue preclusion from arguing that "damages" could mean more. Continuing, Central National argues the mere fact the term "damages" is further defined by the ultimate net loss clause does not call for giving the term a meaning antithetical to the meaning adopted by the Supreme Court.
We are obviously bound by the Powerine I decision's definition of "damages" as stated in the CGL policies. (Auto Equity Sales, Inc. v. Superior Court (1962) 57 Cal.2d 450, 456, 20 Cal.Rptr. 321, 369 P.2d 937.)[8] Yet, we must also consider *841 the specific language of the Central National policy at issue in the context of the broader purpose of the umbrella portion of the policy. (Bank of the West v. Superior Court, supra, 2 Cal.4th at pp. 1264-1265, 10 Cal.Rptr.2d 538, 833 P.2d 545.) A reading that limits the coverage to "damages," as that word was interpreted by Powerine I, would require us to ignore wholesale phrases extant in these policies. To disregard the fact the policies "more fully define[ ]" "expenses" by reference to ultimate net loss, or that the latter clause provides an expansive delineation of the costs covered by the policy, would be to rewrite the entire coverage and ultimate net loss provisions. Yet, "we do not rewrite any provision of any contract, including the standard policy underlying any individual policy, for any purpose. [Citation.]" (Powerine I, supra, 24 Cal.4th at p. 960, 103 Cal.Rptr.2d 672,16 P.3d 94.)
We are unpersuaded by Central National's argument premised on the loss payable provision. Central National quotes from that provision that liability under the policy "shall not attach unless and until the Insured, or the Insured's underlying insurer, shall have paid the amount of the underlying limits on account of such occurrence." Based on this wording, Central National argues where the underlying policies only indemnify for damages in the form of money ordered by a court pursuant to Powerine I, the loss payable condition "evidences the same intent to cover damages arising in a judicial context or in a settlement ... reached with the insurer's consent." However, the loss payable provision is a condition of coverage, not a limitation thereof, and cannot be read to limit the indemnification obligation. (See Croskey, et al., Cal. Practice Guide: Insurance Litigation, supra, § 3:158, p. 3-42 ["As a general rule, conditions neither confer nor exclude coverage"].)[9]
We believe our conclusion about the extent of coverage is the logical extension of Foster-Gardner and Powerine I. We do not create "patchwork distinctions based on slight differences in language" between umbrella and CGL policies, as Central National *842 would have us believe. Rather, we read the unequivocal language of the Central National policies, which includes more terms than the primary insurance policies at issue in Powerine I, to comport with the purpose behind the umbrella provision to indemnify for losses not covered by the primary insurances. In short, both the language and the purpose of these Central National umbrella policies demonstrate the clear intent of the parties to make distinctions that are not "slight."
Having said this, the coverage provision in dispute here cannot be fully analyzed without reference to the defense coverage endorsements to seven of the nine policies issued by Central National between 1973 and 1983.[10] These endorsements obligate Central National to defend "any suit against the insured alleging liability insured under the provisions of this policy and seeking damages on account thereof; "[a]s respects occurrences covered under this policy, but not covered under the underlying insurance or under any other collectible insurance...." Central National and amici argue, based on this duty to defend contained in the defense coverage endorsement, that the Foster-Gardner syllogism applies to limit the scope of the duty to indemnify in the umbrella policies.
As noted, the syllogism provides "[t]he duty to defend is broader than the duty to indemnify[;][t]he duty to defend is [limited to] a `suit,' i.e., a civil action prosecuted in a court.... A fortiori, the duty to indemnify [cannot] extend beyond `damages,' i.e., money ordered by a court...." (Powerine I, supra, 24 Cal.4th at p. 961, 103 Cal. Rptr.2d 672,16 P.3d 94.) Central National and amici argue where the duty to defend is limited in the defense coverage endorsements to suits seeking damages, the duty to indemnify cannot include something more, such as administrative claims.
The syllogism does not apply here for the simple reason that the parties contracted for full indemnity as declared by the broad language of the excess/umbrella policies themselves. The actual words used in the Central National policies' indemnity provision confer broader coverage than those contained in the defense coverage endorsement, or in Powerine I and Foster-Gardner. Hence, the conclusion of the Foster-Gardner syllogism does not logically follow from its premise when applied to the Central National policies. A syllogism is deductive reasoning (Webster's 3d New Internat. Diet., supra, at p. 2315, col. 3) and "do[es] not apply to a policy free from ambiguity" such as the ones before us. (Padberg v. Travelers Companies (1987) 197 Cal.App.3d 1161, 1166, 243 Cal.Rptr. 266.)
Central National next advocates reading a no action clause into this policy. The company insists that the policies cannot be read to mean that the insured could settle claims without Central National's participation and obtain coverage under the policies for settlements to which Central National *843 objected. However, nowhere in this policy is there a stated requirement that Central National must approve settlements or compromises as a prerequisite to coverage.[11] Again, Central National certainly knew how to include a no action condition and we will not rewrite the policy to insert a provision that is otherwise absent. (Powerine I, supra, 24 Cal.4th at p. 960,103 Cal.Rptr.2d 672,16 P.3d 94.)
Nor does the "assistance and cooperation" provision help Central National. That clause gives Central National the option to associate with the insured in the defense or control of any claim, but it does not obligate the insurer to do so. That clause does not substitute for a "no action" condition. Although the right to defend and control any claim or suit might confer the right to run the defense of a suit or claim, it does not therefore follow that expenses incurred in response to an agency abatement and cleanup order are not covered under this policy. The meaning of the insuring clause depends on the words actually used (see Wells Fargo Bank v. California Ins. Guarantee Assn., supra, 38 Cal.App.4th at pp. 947-948, 45 Cal.Rptr.2d 537), not by the words construed from a different insurance policy.

5. Application to facts of this case.

Based on our analysis above, it is clear that the nine Central National umbrella policies issued to Powerine beginning in 1973 provided coverage for costs Powerine incurs in complying with the cleanup and abatement orders issued by the administrative agencies when no lawsuit is filed. As umbrella policies, they provide broader coverage than the coverage contained in the primary policies, and in particular, insure for losses not covered by the primary policies.
The trial court's ruling to the contrary not only ignored the critical differences in the specific language of the umbrella policies here, vis-á-vis the standard general liability policies at issue in Powerine I, but also failed to recognize the purpose behind the umbrella form of insurance in general. In ruling that the definition of "expenses" did not obligate Central National to pay money in addition to those required through adjudication or compromise, the court overlooked the words of the Supreme Court in Powerine I and Foster-Gardner, and of the nine policies at issue.
For the foregoing reasons, Powerine is entitled to judgment in its favor on Central National's motion for summary adjudication as to all nine policies.

DISPOSITION
The order to show cause is discharged. A peremptory writ of mandate shall issue directing the trial court to vacate its order of January 7, 2002, granting Central National's motion for summary adjudication of their duty to indemnify Powerine and to issue a new order denying said motion. *844 Powerine shall recover its costs in this writ proceeding.
We concur: KLEIN, P.J., and KITCHING, J.
NOTES
[1] Other real parties in interest are Century Indemnity Company, ACE Property and Casualty Insurance Company, Pacific Employers Insurance Company, and Central National. Powerine claims Real Parties in Interest are inter-related insurance companies, all falling under the name ACE USA group of insurance companies, successor to CIGNA Property and Casualty Insurance Company. By the time Central National filed its motion for summary judgment, the only cross-defendants remaining in the case were the ACE-related entities, which includes Central National.
[2] The first four Central National policies, CNU 12-20-39, CNU 12-26-82, CNU 12-30-08, CNU 12-56-25, issued commencing in 1973, provide limits of $9,950,000 above underlying primary CGL policies with limits of $50,000. The remaining five Central National policies, CNU 12-79-39, CNU 03-31-78, CNU 03*9-44, CNU 00-40-80, CNU 00-81-61, each provides $9,500,000 in indemnity limits above a $50,000 self-insured retention and a primary policy with limits of $450,000.

Hereinafter, we will refer to all nine policies under consideration as the Central National policies.
[3] The language under scrutiny is identical throughout the nine policies. The parties attached portions of these policies as an exhibit. The remaining terms and conditions of the nine Central National policies were not included as part of the stipulation of facts submitted to the trial court in connection with Central National's motion for summary adjudication.
[4] See footnote 3, supra.
[5] As explained in Powerine I, "one might speak of a `sum that the insured becomes legally obligated to pay' simpliciteromitting `as damages'apart from any order by a court. For one might say that the insured is legally obligated to pay some such sum under abstract legal rules alone. Thus, one might say that a driver of an automobile is legally obligated to comply with all laws relating to use of the roads apart from any order by a court. One might also say that the driver is legally obligated to pay the toll required by such laws for passage over a designated bridge apart from any such order. [¶] But one would not speak of any `sum that the insured becomes legally obligated to pay as damages' apart from any order by a court." (Powerine I, supra, 24 Cal.4th at p. 963, 103 Cal.Rptr.2d 672, 16 P.3d 94, original italics, fn. omitted.)
[6] Otherwise, Central National's reliance on FMC Corp. v. Plaisted & Companies (1998) 61 Cal.App.4th 1132, at page 1201, 72 Cal. Rptr.2d 467 is unavailing. The issue discussed at that part of FMC was whether the indemnity provision in a policy that had no duty to defend gave the insured the right to immediate reimbursement of defense costs before there was a judicial determination the policies covered the underlying claim. FMC never addressed the scope of coverage at issue here.
[7] Central National argues it makes no difference to the result that its insurance is in the umbrella form and not CGL because Powerine I was a "product of a methodical and comprehensive review of common policy provisions in light of their function in the tort system" and "`considered in their full context.' " The contention ignores the fact that the decision in Powerine I restricted its review and holding to the specific language in the CGL insurance policy providing primary coverage whose language was manifestly different than the language at issue here.
[8] Central National insists that our decision in Powerine I (Certain Underwriters v. Superior Court (1999) 75 Cal.App.4th 1038 [89 Cal. Rptr.2d 706], review granted Feb. 16, 2000, S084057, and superseded by Powerine I, supra, 24 Cal.4th 945, 103 Cal.Rptr.2d 672, 16 P.3d 94) precludes Powerine from arguing that the scope of coverage here is not limited to money ordered by a court. Observing that in our Powerine I decision we mentioned one umbrella and four excess policies issued by the insurer in addition to the primary policy, Central National asserts that that decision "definitively resolved the identical issue," namely, that "no coverage exists for administratively imposed costs under [the insurer's] excess and umbrella policies covering damages that the insured is legally obligated to pay." Central National argues any references we made to the umbrella policy in that opinion is law of the case and is binding on Powerine inasmuch as Powerine did not appeal from that issue and the issue was not addressed by the Supreme Court in Powerine I. Not so.

First, we stated clearly in our opinion that "we are only concerned with the primary policy issued to Powerine by Certain Underwriters," and "we have no reason to reach or consider the several excess policies which Certain Underwriters also issued over a 20-year period...." Such statements render any comments made about the secondary policies pure obiter dictum. Second, we quoted from the language of the excess and umbrella policies in that opinion. The language is materially different from the language at issue here because, inter alia, the policies' language does not "more fully define" the term "damages" by reference to another clause in the policy. For these reasons, our opinion in Powerine I is neither law of the case nor binding on Powerine for anything involving the excess or umbrella policies there.
[9] Another reason Central National's argument is unavailing is that the loss payable provision was designed to guarantee that the full amount of the underlying limits have been paid before the excess policy is invaded. Thus, the provision governs the timing of claims submissions by the insured and contains 3 triggers, only one of which requires a pre-existing court-rendered judgment: "The Insured shall make a definite claim for any loss for which the Company may be liable under the policy within 12 months [1] after the Insured shall have paid an amount of ultimate net loss in excess of the amount borne by the Insured or [2] after the Insured's liability shall have been fixed and rendered certain either by final judgment against the Insured after actual trial or [3] by written agreement of the Insured, the claimant, and the Company." (Italics added.) The first method for triggering the excess coverage is where the "insured shall have paid" the specified retained limit. It is therefore irrelevant that the policies also identify the payment of a judgment as an alternative method.
[10] Central National attached to its opposition to Powerine's writ petition a copy of a defense coverage endorsement to the policy CNU 12-79-39, effective October 8, 1977. Powerine moved to strike the attachment on the grounds it was not included in the stipulated facts presented to the court in connection with the summary adjudication motion that gave rise to the instant writ proceeding. In response, Central National has requested that we take judicial notice of the defense coverage endorsements. Central National asserts that the full contents of all nine policies were attached to Powerine's own cross-complaint with the result the full policies and endorsements were before the trial court, albeit not specifically so in connection with Central National's summary adjudication motion. We conclude we may take judicial notice of the defense coverage endorsements as they are part of the record below. (Evid.Code, § 452, subd. (d).)
[11] Note also that the policies obligate Central National to indemnify Powerine not only for "sums which the insured shall be obligated to pay by reason of the liability [¶] (a) imposed upon the Insured by law," but also for the liability "(b) assumed under contract or agreement by the Named Insured and/or any officer, director, stockholder, partner or employee of the Named Insured..." (Italics added.) Central National insists it could not have possibly meant to become obligated to Powerine for contracts into which Powerine entered without Central Nationals prior approval. However, the policies contain neither a no action nor a no voluntary payment clause. "[T]he pertinent policies provide what they provide. [The parties] were generally free to contract as they pleased. [Citation.] They evidently did so. They thereby established what was `fair' ... inter se. We may not rewrite what they themselves wrote. [Citation.]" (Aerojet-General Corp. v. Transport Indemnity Co., supra, 17 Cal.4th at p. 75, 70 Cal.Rptr.2d 118, 948 P.2d 909.)