[No. S108308. June 12, 2003.]

GEORGE ROSEN, Plaintiff and Respondent, v.
STATE FARM GENERAL INSURANCE COMPANY, Defendant and
Appellant.

## COUNSEL

Robie & Matthai, James R. Robie, Michael J. O'Neill; Dunn Koes, Pamela E. Dunn and Daniel J. Koes for Defendant and Appellant.

Sonnenschein Nath & Rosenthal, Paul E. B. Glad and Cheryl Dyer Berg for National Association of Independent Insurers, United Services Automobile Association and Fireman's Fund Insurance Company as Amici Curiae on behalf of Defendant and Appellant.

Deborah J. La Fetra for Pacific Legal Foundation as Amicus Curiae on behalf of Defendant and Appellant.

Morton, Lulofs & Wood, William R. Morton and Karen D. Marcus for California State Automobile Association Inter-Insurance Bureau as Amicus Curiae on behalf of Defendant and Appellant.

Horvitz & Levy, Barry R. Levy and Peter Abrahams for Farmers Insurance Exchange, Fire Insurance Exchange, Truck Insurance Exchange, American International Companies and Personal Insurance Federation of California as Amici Curiae on behalf of Defendant and Appellant.

Hancock Rothert & Bunshoft, William J. Baron and Kathryn C. Ashton for London Market Insurers as Amicus Curiae on behalf of Defendant and Appellant.

Summers & Shives, Robert V. Closson and Pamela A. Mckay for Professional Association of Specialty Contractors as Amicus Curiae on behalf of Defendant and Appellant.

Wiley Rein & Fielding, Laura A. Foggan, John C. Yang, Ederlina Y. Co; Sinnott, Dito, Moura & Puebla, Randolph P. Sinnott and JoLynn M. Pollard

for Complex Insurance Claims Litigation Association as Amicus Curiae on behalf of Defendant and Appellant.

Verboon, Milstein & Peter and Wayne S. Kreger for Plaintiff and Respondent.

Chipman Miles & Associates, Chipman Miles, Brian Miles and Joel M. Westbrook for United Policyholders as Amicus Curiae on behalf of Plaintiff and Respondent.

## OPINION

**BROWN, J.**—The insurance policy in this case defined "collapse" as "actually fallen down or fallen to pieces." However, sound public policy, the Court of Appeal concluded, requires coverage for imminent, as well as actual, collapse, lest dangerous conditions go uncorrected. By failing to apply the plain, unambiguous language of the policy, the Court of Appeal erred. (Civ. Code, § 1644.) ■ "[W]e do not rewrite any provision of any contract, [including an insurance policy], for any purpose." (*Certain Underwriters at Lloyd's of London v. Superior Court* (2001) 24 Cal.4th 945, 968 [103 Cal.Rptr.2d 672, 16 P.3d 94] (*Lloyd's of London*).)

### FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff submitted a claim to defendant, his homeowners insurance carrier, for the cost of repairing two decks attached to his home. Plaintiff repaired the decks upon the recommendation of a contractor who had discovered severe deterioration of the framing members supporting the decks. Plaintiff believed his decks were in a state of *imminent* collapse, entitling him to policy benefits.

Defendant denied plaintiff's claim on the ground, among others, that there had been no collapse of his decks within the meaning of the policy, in that its coverage was expressly restricted to *actual* collapse.

The "Losses Not Insured" section of plaintiff's homeowners policy provided that defendant did not insure for any loss to the dwelling caused by "collapse, except as specifically provided in SECTION I - ADDITIONAL COVERAGES, Collapse." That provision stated: "We insure only for direct physical loss to covered property involving the sudden, entire collapse of a building or any part of a building. [¶] Collapse means *actually fallen down or fallen into pieces*. It does not include settling, cracking, shrinking, bulging, expansion, sagging or bowing."

Plaintiff sued defendant for breach of contract and breach of the covenant of good faith and fair dealing. Defendant moved for summary judgment, arguing that plaintiff did not suffer a compensable loss because the decks did not actually collapse.[1] In his opposition to the motion, plaintiff argued there was a material factual issue as to whether his decks were in a state of imminent collapse. Plaintiff also argued that public policy required that the collapse provision of the policy be construed to provide coverage for imminent collapse. The trial court denied defendant's motion for summary judgment, concluding there were triable issues of material fact. The parties agreed to try the case to the court on the narrow issue of whether defendant owed plaintiff policy benefits due to the *imminent* collapse of his decks.

The trial court found for plaintiff. "The public policy of the State of California is . . . that policyholders are entitled to coverage for collapse as long as the collapse is imminent, *irrespective of policy language*." The trial court declined to honor the policy's restriction of coverage because it would, in the court's view, "encourage property owners to place lives in danger in order to allow insurance carriers to delay payment of claims until the structure actually collapses . . . ."

The Court of Appeal affirmed, holding that a homeowners policy that expressly defines the term *collapse* as *actually fallen down or fallen into pieces* must, nevertheless, for reasons of public policy, be construed as providing coverage for *imminent* collapse.

We reverse.

## DISCUSSION

■ " '[I]nterpretation of an insurance policy is a question of law.' (*Waller* v. *Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 18 [44 Cal.Rptr.2d 370, 900 P.2d 619] (*Waller*).) 'While insurance contracts have special features, they are still contracts to which the ordinary rules of contractual interpretation apply.' (*Bank of the West* v. *Superior Court* (1992) 2 Cal.4th 1254, 1264 [10 Cal.Rptr.2d 538, 833 P.2d 545] (*Bank of the West*).) Thus, 'the mutual intention of the parties at the time the contract is formed governs interpretation.' (*AIU Ins. Co.* v. *Superior Court* (1990) 51 Cal.3d 807, 821 [274 Cal.Rptr. 820, 799 P.2d 1253] (*AIU Ins.*).) If possible, we infer this intent solely from the written provisions of the insurance policy. (See *id.* at p. 822.) If the policy language 'is clear and explicit, it governs.' (*Bank of the*

---

[1] In the alternative, defendant moved for summary adjudication of plaintiff's claim for breach of the covenant of good faith and fair dealing and his request for punitive damages. Prior to trial, plaintiff dismissed these claims.

*West, supra,* 2 Cal.4th at p. 1264.)" (*Palmer v. Truck Ins. Exchange* (1999) 21 Cal.4th 1109, 1115 [90 Cal.Rptr.2d 647, 988 P.2d 568].)

As the Court of Appeal acknowledged, the policy language here was clear and explicit. "The plain language of the collapse provision in Rosen's homeowners policy is unambiguous, in that it is susceptible only of one reasonable interpretation—actual collapse of a building or a portion thereof is a prerequisite to an entitlement to policy benefits. By defining the term 'collapse' to mean 'actually fallen down or fallen into pieces,' State Farm effectively removed any ambiguity in the term collapse. Under no stretch of the imagination does actually mean imminently."

The lack of ambiguity in the collapse provision here distinguishes this case, the Court of Appeal pointed out, from the case upon which the trial court principally relied—*Doheny West Homeowners' Assn. v. American Gurantee & Liability Ins. Co.* (1997) 60 Cal.App.4th 400 [70 Cal.Rptr.2d 260] (*Doheny West*).

In *Doheny West, supra,* 60 Cal.App.4th at pages 402-403, the homeowners association of a large condominium complex sued its property insurer for breach of contract and bad faith, alleging that the parking structure of the complex, as well as the swimming pool and associated facilities built above the parking structure, had been in a state of imminent collapse, and that the insurer had wrongfully denied a claim for the necessary repairs the association had made to the structure.

Unlike the policy in this case, the *Doheny West* policy did not specify that the reach of the term *collapse* was restricted to *actual* collapse. Instead, the *Doheny West* policy excluded coverage for collapse except " 'for loss or damage caused by or resulting from risks of direct physical loss involving collapse of a building or any part of a building' " resulting from specified causes. (*Doheny West, supra,* 60 Cal.App.4th at p. 402.) While the *Doheny West* trial court held that this language embraced imminent as well as actual collapse, the trial court found for the defendant insurer on the ground the plaintiff homeowners association had not met its burden of proving that any part of the building was in a state of imminent collapse. (*Id.* at p. 403.)

The Court of Appeal affirmed. Noting that its task was not merely to construe the word *collapse* in isolation, but rather to construe the total coverage clause, the Court of Appeal held that the coverage clause before it "cannot be said to be clear, explicit, and unambiguous, and thus must be interpreted to protect the objectively reasonable expectations of the insured. [Citation.]" (*Doheny West, supra,* 60 Cal.App.4th at p. 405.) With these

principles in mind, the Court of Appeal stated: "It is undisputed that the clause covers 'collapse of a building,' that is, that there is coverage if a building falls down or caves in. However, the clause does not limit itself to 'collapse of a building,' but covers 'risk of loss,' that is, the threat of loss. Further, on its terms it covers not only loss resulting from an actual collapse, but loss 'involving' collapse. Thus, with the phrases 'risk of loss,' and 'involving collapse,' the policy broadens coverage beyond actual collapse." (*Ibid.*, fn. omitted.)

However, the Court of Appeal rejected the plaintiff's contention that the policy phrases in question "broaden[ed] coverage to the extent that the clause covers 'substantial impairment of structural integrity.'" (*Doheny West, supra,* 60 Cal.App.4th at p. 405.) The Court of Appeal concluded that the trial court had correctly interpreted the policy language before it "by requiring that [the] collapse be actual or imminent." (*Id.* at p. 406, fn. omitted.) "This construction of the policy," the Court of Appeal observed, "avoids both the absurdity of requiring an insured to wait for a seriously damaged building to fall and the improper extension of coverage beyond the terms of the policy, and is consistent with the policy language and the reasonable expectations of the insured." (*Ibid.*)

We agree with the Court of Appeal that *Doheny West* is distinguishable from this case. ■ As the Court of Appeal observed: "It is a well-established rule that an opinion is only authority for those issues actually considered or decided. (*Santisas v. Goodin* (1998) 17 Cal.4th 599, 620 [71 Cal.Rptr.2d 830, 951 P.2d 399]; *Wilshire Ins. Co. v. Tuff Boy Holding, Inc.* (2001) 86 Cal.App.4th 627, 639 [103 Cal.Rptr.2d 480].) At no time did the court in *Doheny* [*West*] hold that an unambiguous collapse provision expressly limiting recovery to actual collapse must nevertheless be construed to provide coverage for imminent collapse. The court also did not purport to discern a public policy establishing a contractual entitlement to coverage for imminent collapse in all cases. It simply construed the ambiguous collapse provision before it, as it was required to do. (*AIU Ins.*[, *supra,*] 51 Cal.3d 807, 822 . . . .) In so doing, it was required to resolve the ambiguity in favor of the insured and in accordance with the reasonable expectations of the insured. (*Kazi v. State Farm Fire & Casualty Co.* (2001) 24 Cal.4th 871, 879 [103 Cal.Rptr.2d 1, 15 P.3d 223].) [¶] In construing the collapse provision in *Doheny* [*West*] to provide coverage for both actual and imminent collapse, the court expressly relied on the broad language of that particular policy. Specifically, the court held that the 'phrases "risk of loss," and "involving collapse"' effectively 'broaden[ed] coverage beyond actual collapse.' The State Farm [collapse provision at issue in this case, *however*, does not contain any *comparable*] language that can be construed to extend coverage beyond actual collapse."

However, "[n]otwithstanding the lack of ambiguity in State Farm's collapse provision," the Court of Appeal held, "as a matter of public policy, that State Farm must provide insurance benefits for imminent collapse of Rosen's two decks."

The Court of Appeal gave the following explanation for its decision not to enforce this unambiguous coverage provision: "The notion that in the absence of coverage for imminent collapse an insured may wait until the full or partial actual collapse of a building simply to ensure coverage is troubling indeed. The actual collapse of a building or any part of a building tragically can result in serious injury or loss of human life, as well as substantial property damage. A requirement that an insurer provide coverage when collapse is imminent clearly is in the best interests not only of the insured and the insured's visitors but also of the insurer. Rectifying the problem prior to an actual collapse may well save lives and money. Moreover, our holding does not unduly burden the insurer because its liability is limited for a loss which is imminent, and, thus, soon to occur anyway. Surely, an insurer's exposure to liability will be far greater in the event of an actual collapse. [¶] Any holding to the contrary would encourage property owners to risk serious injury or death or greater property damage simply to ensure that coverage would attach. We cannot and will not sanction such a result. We therefore conclude that notwithstanding the language of the collapse provision, public policy mandates that State Farm afford Rosen coverage for the imminent collapse of his decks."

Applying the same logic, with the same lack of restraint, courts could convert life insurance into health insurance. In rewriting the coverage provision to conform to their notions of sound public policy, the trial court and the Court of Appeal exceeded their authority, disregarding the clear language of the policy and the equally clear holdings of this court. In *Foster-Gardner, Inc. v. National Union Fire Ins. Co.* (1998) 18 Cal.4th 857 [77 Cal.Rptr.2d 107, 959 P.2d 265], we held that an insurer's duty to defend its insured in a "suit seeking damages" was limited to a civil action prosecuted in court, and did not extend to a proceeding conducted before an administrative agency pursuant to an environmental statute. The Court of Appeal in *Fireman's Fund Ins. Co. v. Superior Court* (1997) 65 Cal.App.4th 1205 [78 Cal.Rptr.2d 418], we noted with approval, had rejected the "suggestion . . . 'because it is in the nation's best interests to have hazardous waste cleaned up, our courts must construe insurance policies to provide coverage for such remedial work lest the insureds be discouraged from cooperating with the EPA.'" (*Foster-Gardner*, at p. 888.) "[T]he Court of Appeal in *Fireman's Fund* aptly stated, 'While we agree that it is in everyone's best interests to have hazardous wastes cleaned up, we do not

agree that a California court may rewrite an insurance policy for that purpose or for any purpose. This is a contract issue, and imposition of a duty to defend CERCLA proceedings that have not ripened into suits would impose on the insurer an obligation for which it may not be prepared. . . . Whatever merit there may be to these conflicting social and economic considerations, they have nothing whatsoever to do with our determination whether the policy's disjunctive use of "suit" and "claim" creates an ambiguity.' (*Fireman's Fund, supra*, 65 Cal.App.4th at p. 1214, fn. 8, see also *AIU* [*Ins.*], *supra*, 51 Cal.3d at p. 818 ['The answer is to be found solely in the language of the policies, not in public policy considerations'].)" (*Ibid.*, fn. omitted.)

█ In *Lloyd's of London, supra*, 24 Cal.4th 945, we held that an insurer's duty to indemnify its insured for "all sums that the insured becomes legally obligated to pay as damages" is limited to money ordered by a court, and does not extend to expenses required by an administrative agency pursuant to an environmental statute. We rejected the argument that we should rewrite the indemnification provision, extending it to cleanup orders issued by an environmental agency, in order "to advance the cleanup of a contaminated site and the abatement of the contamination's effects by calling in the insurer's resources in supplement to those of an insured that is prosperous or in place of those of an insured that is not. Our reason is that we do not rewrite any provision of any contract, including the standard policy underlying any individual policy, for any purpose. (See *Aerojet-General Corp. v. Transport Indemnity Co.* [(1997)] 17 Cal.4th [38,] 75-76 [70 Cal.Rptr.2d 118, 948 P.2d 909].) To do so with regard to the standard policy, with which we are here concerned, might have untoward effects generally on individual insurers and individual insureds and also on society itself. Through the standard policy, individual insurers made promises, and individual insureds paid premiums, against the risk of loss. To rewrite the provision imposing the duty to indemnify in order to remove its limitation to money ordered by a court might compel insurers to give more than they promised and might allow insureds to get more than they paid for, thereby denying their 'general[] free[dom] to contract as they please[]' of any effect in the matter. (*Id.* at p. 75; accord, *Linnastruth v. Mut. Benefit etc. Assn.* (1943) 22 Cal.2d 216, 218 [137 P.2d 833].) It is conceivable that to rewrite the provision thus might result in providing society itself with benefits that might outweigh any costs that it might impose on individual insurers and individual insureds. It is conceivable. But unknown. Knowledge 'depend[s] in large part on' what we are ill suited for, that is, the 'amassing and analyzing of complex and extensive empirical data.' (*Aerojet-General Corp. v. Transport Indemnity Co., supra*, 17 Cal.4th at p. 76.) Without such knowledge we could not proceed." (*Lloyd's of London, supra*, 24 Cal.4th at pp. 967-968.)

Plaintiff contends that recent legislation establishing a limited new cause of action for certain specified housing defects (Sen. Bill No. 800 (2001-2002

Reg. Sess.) chaptered as Stats. 2002, ch. 722, § 3 [adding Civ. Code, § 895 et seq., eff. Jan. 1, 2003]), read in light of our decision in *Aas v. Superior Court* (2000) 24 Cal.4th 627 [101 Cal.Rptr.2d 718, 12 P.3d 1125] (*Aas*), provides this court with a statutory basis for refusing to enforce the plain language restricting the coverage of this policy for collapse to actual collapse. The contention lacks merit.

In *Aas*, *supra*, 24 Cal.4th 627, we applied the economic loss rule in a negligence action by homeowners against the developer, contractor, and subcontractors who built their dwellings. The plaintiffs alleged that their homes suffered from many construction defects, but they conceded that many of the defects had caused no bodily injury or property damage. The trial court barred them from introducing evidence of the defects that had caused no injury to persons or property. We upheld the trial court's ruling. ■ We explained that under the economic loss rule, "appreciable, nonspeculative, present injury is an essential element of a tort cause of action." (*Id.* at p. 646.) "Construction defects that have not ripened into property damage, or at least into involuntary out-of-pocket losses," we held, "do not comfortably fit the definition of ' "appreciable harm" '—an essential element of a negligence claim." (*Ibid.*)

In enacting Senate Bill No. 800 (2001-2002 Reg. Sess.), the Legislature sought to respond to, among other things, "concerns expressed by homeowners and their advocates over the effects" of our decision in *Aas*, *supra*, 24 Cal.4th 627 "that defects must cause actual damage prior to being actionable in tort." (Sen. Com. on Judiciary, Analysis of Sen. Bill No. 800 (2001-2002 Reg. Sess.) as amended Aug. 28, 2002, p. 1.) In summary, Senate Bill No. 800 "[p]rovides for detailed and specific liability standards for newly constructed housing. Establishes definitions of construction defects. Creates a new prelitigation process that requires that claimants alleging a defect give builders notice of the claim, following which the builder has an absolute right to repair before the homeowner can sue for a violation of those standards. [¶] If the builder fails to acknowledge the claim within the time specified, elects not to go through the statutory process, fails to request an inspection within the time specified, or declines the offer to repair, or if the repair is inadequate, the homeowner is relieved from any further prelitigation process. Provides third-party inspectors with immunity from liability." (Judicial Council of Cal., Court News Special Ed., 2002 Legis. Summary (Dec. 2002) <http//www.courtinfo.ca.gov/courtnews/legsumdec02.pdf> [as of June 12, 2003].)

■ Senate Bill No. 800 (2001-2002 Reg. Sess.), plaintiff argues, "affords this Court with the statutory basis for rejecting [defendant's] actual

collapse definition: requiring [plaintiff] to wait for the decks to actually collapse off the side of his home before coverage would attach is akin to requiring a homeowner to wait for damage to result from a defect before he can sue the homebuilder." Plaintiff's analogy fails. Senate Bill No. 800 is applicable "only to residences originally sold on or after January 1, 2003." (Civ. Code, § 938.) It is one thing for the Legislature to rewrite the rules for construction defect litigation for homes sold in the future. In *Aas*, we emphasized that "the Legislature may add whatever additional protections it deems appropriate . . . ." (*Aas, supra*, 24 Cal.4th at p. 653.) However, it would be quite another thing for this court to rewrite the coverage provision of an existing homeowners insurance policy to remove a restriction. Again, by agreeing to this contract of insurance, the insurer made promises, and the insured paid premiums, against the risk of loss. To rewrite the provision imposing the duty to indemnify in order to remove its limitation to actual collapse would compel the insurer to give more than it promised and would allow the insured to get more than it paid for, thereby denying their freedom to contract as they please. (*Lloyd's of London, supra*, 24 Cal.4th at pp. 967-968.)

## DISPOSITION

The judgment of the Court of Appeal is reversed and the matter remanded for further proceedings consistent with this opinion.

George, C. J., Baxter, J., and Chin, J., concurred.

**MORENO, J.**—I concur with the result. I also concur in the majority's conclusion that the coverage provision is unambiguous in this case. But I do not agree with the majority's conclusion that courts are forbidden from employing public policy when determining how insurance policy clauses are to be interpreted and enforced. The majority quotes from *Certain Underwriters at Lloyd's of London v. Superior Court* (2001) 24 Cal.4th 945, 968 [103 Cal.Rptr.2d 672, 16 P.3d 94] (*Lloyd's of London*), for the proposition that " 'we do not rewrite any provision of any contract, including [an insurance] policy, for any purpose.' " (Maj. opn., *ante*, at p. 1078.) *Lloyd's of London* in turn quotes *Linnastruth v. Mut. Benefit etc. Assn.* (1943) 22 Cal.2d 216, 218 [137 P.2d 833] for the proposition that parties to an insurance contract having the " 'general[] free[dom] to contract as they please.' " (*Lloyd's of London, supra*, 24 Cal.4th at p. 968.) *Linnastruth* in fact states that "parties may contract as they please so long as they do not violate the law *or public policy*" and that this principle "is applicable to insurance contracts." (*Linnastruth, supra*, 22 Cal.2d at p. 218, italics added.)

Notwithstanding the categorical statements of the majority and of *Lloyd's of London*, it is still true that we will not enforce terms of contracts that

violate public policy. The public policy in question may sometimes be based on statute (see, e.g., *Wildman v. Government Employees Ins. Co.* (1957) 48 Cal.2d 31 [307 P.2d 359]) but does not necessarily have to be—it can be based on other policies perceived to be contrary to the public welfare. (See *Atschul v. Sayble* (1978) 83 Cal.App.3d 153, 162 [147 Cal.Rptr. 716] [court refuses to enforce fee-for-referral agreements among attorneys as contrary to public policy].) We have never held that this principle is inapplicable to insurance contracts. (See *AIU Ins. Co. v. Superior Court* (1990) 51 Cal.3d 807, 821-822 [274 Cal.Rptr. 820, 799 P.2d 1253] [general contract principles are applicable to insurance contracts].)

Indeed, in some instances, courts have modified or supplemented language in insurance policies on essentially public policy grounds. For example, courts have held that, notwithstanding clauses in insurance policies that require the insured's cooperation and timely notice of a claim to an insurer, breach of those terms would not serve as a defense to insurance coverage if the insurer has not been prejudiced thereby. (*Northwestern Title Security Co. v. Flack* (1970) 6 Cal.App.3d 134, 140 [85 Cal.Rptr. 693]; *Campbell v. Allstate Ins. Co.* (1963) 60 Cal.2d 303, 306 [32 Cal.Rptr. 827, 384 P.2d 155].)

The argument in favor of the Court of Appeal's and the insured's position takes the above principles as a point of departure. The Court of Appeal reasoned that there are compelling public policy grounds not to enforce the "actual collapse" limitation at issue here when it would preclude coverage for imminent collapse. As the court stated: "The notion that in the absence of coverage for imminent collapse an insured may wait until the full or partial actual collapse of a building simply to ensure coverage is troubling indeed. The actual collapse of a building or any part of a building can tragically result in serious injury or loss of human life, as well as substantial property damage. A requirement that an insurer provide coverage when collapse is imminent clearly is in the best interests not only of the insured and the insured's visitors but also of the insurer. Rectifying the problem prior to an actual collapse may well save lives and money. Moreover, our holding does not unduly burden the insurer because its liability is limited for a loss that is imminent, and, thus, soon to occur anyway. Surely, an insurer's exposure to liability will be far greater in the event of an actual collapse. [¶] Any holding to the contrary would encourage property owners to risk serious injury or death or greater property damage simply to ensure that coverage would attach. We cannot and will not sanction such a result. We therefore conclude that notwithstanding the language of the collapse provision, public policy mandates that State Farm afford Rosen coverage for the imminent collapse of his decks."

The Court of Appeal's reasoning is not without force. An insurance policy that clearly establishes a financial incentive to maintain a hazardous condition injurious to the public may well be contrary to public policy. This case is therefore distinguishable from those cases cited by the majority in which enforcement of a policy exclusion would not create such a perverse incentive but merely retard the accomplishment of some worthwhile goal, such as cleanup of hazardous wastes. (See, e.g., *Foster-Gardner, Inc. v. National Union Fire Ins. Co.* (1998) 18 Cal.4th 857 [77 Cal.Rptr.2d 107, 959 P.2d 265].)

The Court of Appeal's reasoning is, however, ultimately unpersuasive. In determining whether a contract·violates public policy, courts essentially engage in a weighing process, balancing the interests of enforcing the contract with those interests against enforcement. (*Bovard v. American Horse Enterprises, Inc.* (1988) 201 Cal.App.3d 832, 840-841 [247 Cal.Rptr. 340], citing Rest.2d Contracts, § 178.) But the cases make clear that the judicial power to declare public policy in the context of contract interpretation and enforcement should be exercised with great caution. " ' " 'The power of the courts to declare a contract void for being in contravention of sound public policy is a very delicate and undefined power, and, like the power to declare a statute unconstitutional, should be exercised only in cases free from doubt.' [Citation.] . . . 'No court ought to refuse its aid to enforce a contract on doubtful and uncertain grounds. The burden is on the [one challenging the contract] to show that its enforcement would be in violation of the settled public policy of this state, or injurious to the morals of its people.' " ' " (*Bovard v. American Horse Enterprises, Inc., supra*, 201 Cal.App.3d at p. 839.)

In this case, there is a strong public policy in favor of allowing insurers to enforce unambiguous policy·provisions, thereby encouraging stability in the insurance industry and allowing insurers the benefit of the bargain created by such unambiguous language. On the other hand, the extent of the danger to the public that the Court of Appeal and plaintiff identify is very much in doubt. The argument that literal enforcement of the policy provision at issue will create substantial financial incentives to allow decks to collapse so as to injure the public ignores the existence of various countervailing disincentives. These include the tort duty imposed on property owners not to injure others through their property's hazardous conditions, as well as the strong interest in keeping oneself, one's family, and persons invited onto one's property, free from harm. Nor can we say with confidence that the Court of Appeal's conclusion is correct that its holding would ultimately benefit the insurer—the insurer is in a far better position to make that determination. Given these doubts, and given the strong policy in favor of enforcing

unambiguous terms, I cannot say the insured has carried its burden of demonstrating that public policy compels us to invalidate or reinterpret the "actual collapse" provision of this insurance policy.

Kennard, J., and Werdegar, J., concurred.