[No. B184613. Second Dist., Div. One. Aug. 30, 2006.]

ANCHOR LIGHTING, Plaintiff and Appellant, v.
SOUTHERN CALIFORNIA EDISON COMPANY et al., Defendants and
Respondents.

**COUNSEL**

Paul G. Kerkorian; Berding & Weil, Daniel L. Rottinghaus and Steven R. Weinmann for Plaintiff and Appellant.

Brian A. Cardoza, Bruce A. Reed and Richard D. Arko for Defendants and Respondents.

**OPINION**

**VOGEL, J.**—In the late 1990's, the Legislature compelled electricity suppliers to reduce their rates for residential and certain small commercial customers, and the Public Utilities Commission was empowered to implement the

program. The case before us is pursued by Anchor Lighting, a customer that did not qualify for Southern California Edison's 10 percent rate reduction for its small commercial customers. The trial court concluded that it lacked jurisdiction to consider Anchor's claims and resolved this lawsuit on that basis. We affirm.

## BACKGROUND

### A.

In 1996, the Legislature enacted the Electric Utilities Restructuring Act (Assem. Bill No. 1890 (1995–1996 Reg. Sess.)) to conform to changes in federal law intended to increase competition in the provision of electricity. (Stats. 1996, ch. 854, § 1, p. 4489, § 10, p. 4505; Pub. Util. Code, § 330 et seq.)[1] The Act declared the Legislature's intent to reduce electricity rates for residential and small commercial customers and, to that end, endorsed the CPUC's finding that California would be best served by a move from the existing regulatory framework in which retail electricity was provided principally by territory to a "framework under which competition would be allowed in the supply of electric power and customers would be allowed to have the right to choose their supplier of electric power." (§ 330, subd. (d).) Costs ancillary to the transition were to be collected "over a specific period of time on a nonbypassable basis and in a manner that [did] not result in an increase in rates to customers of electrical corporations." (§ 330, subd. (v).)

More specifically (and as relevant to this appeal), the Act expressed the Legislature's intent "to require and enable electrical corporations to monetize a portion of the competition transition charge for residential and small commercial consumers so that these customers [would] receive rate reductions of no less than 10 percent for 1998 continuing through 2002. . . ." (§ 330, subd. (w).)[2] The Legislature gave the CPUC and the electricity corporations authority to "fill in" the gaps in the statutory framework (*Re Proposed Policies Governing Restructuring California's Electric Services Industry and Reforming Regulation* (1996) 70 Cal.P.U.C.2d 207, 218), and imposed on

---

[1] Undesignated section references are to the Public Utilities Code, and our references to the CPUC are to the California Public Utilities Commission.

[2] "Monetize" means "[t]o convert an asset [or] debt into money, to realize the value of [the asset or debt] as currency; *spec.* to convert government debt to a more liquid form, as by redeeming treasury bills or replacing bonds with bills. Also: to assess in terms of monetary value." (Oxford English Dict. <http://dictionary.oed.com/cgi/entry/00313966?single=1&query_type=word& queryword=monetize&first=1&max_to_show=10> [as of Aug. 30, 2006].) "Small commercial customer" is defined as a customer with a "maximum peak demand of less than 20 kilowatts." (§ 331, subd. (h).)

electric utilities an obligation to "secure the means to finance the competition transition charge by applying concurrently for financing orders from the [CPUC] and for rate reduction bonds from the California Infrastructure and Economic Development Bank." (§ 330, subd. (w).) In short, each electrical corporation had to submit rate reduction and financing proposals to the CPUC, and the Legislature understood that the revenue lost by the reduced rates would be replaced by rate recovery bonds authorized by financing orders approved by the CPUC. (§§ 330, 368, 840.)

## B.

In October 1996, Southern California Edison Company (SCE) submitted a cost recovery plan to the CPUC in which it proposed a 10 percent rate reduction for "small commercial customers" (as defined by SCE's tariffs as "GS-1" customers) to be paid with rate reduction bonds.[3] The CPUC approved the plan in December. In April 1997, the CPUC issued a public notice (Resolution 173) of the timetable for submission of applications for financing orders, making it clear that financing orders approved by the CPUC to cover rate discounts would be "final and irrevocable." There were provisions for protests, responses, and hearings, and the Act itself expressly provides that financing orders are "irrevocable." (§ 841, subd. (c).)[4]

---

[3] Under the Act, customers with a "maximum peak demand of less than 20 kilowatts" were entitled to rate reductions "of no less than 10 percent for 1998 continuing through 2002." (§§ 330, subd. (w), 331, subd. (h).) SCE's proposal offered this rate to GS-1 customers but not to its GS-2 customers, those with an energy demand of *up to* 500 kilowatts. The GS-1 rate was described as a "general service, non-demand metered rate intended for smaller sized customers whose demand [did] not exceed 20 kW." The GS-2 rate was described as a "general service demand-metered rate schedule intended for medium-size customers where the customer's demand is generally 500 kW or less." As explained in SCE's proposal, an SCE customer could have a peak energy demand of less than 20 kilowatts in a given month but would not be defined as small commercial customer if at other times it had an energy demand of up to 500 kilowatts. If a customer had a peak energy demand of less than 20 kilowatts for 12 consecutive months, the customer would be moved from the GS-2 group to the GS-1 group and charged the reduced rates. Thus, SCE's CPUC filings construed "small commercial customer" to mean a customer with a maximum peak demand of less than 20 kilowatts on a regular basis. The CPUC, which was fully aware of the distinction SCE made between GS-1 and GS-2 customers, approved SCE's interpretation, finding "[t]he rate reduction applies to residential and small commercial customers as defined in [section 331, subdivision (h)]. For this purpose, [SCE's] eligible customers are those serviced on rate schedules in [SCE's] Domestic and General Service (GS-1) rate group."

[4] As relevant, subdivision (c) of section 841 provides that financing orders "shall be irrevocable and the [CPUC] shall not have authority either by rescinding, altering, or amending the financing order or otherwise, to revalue or revise for ratemaking purposes the transition costs, or the costs of providing, recovering, financing, or refinancing the transition costs, determine that the fixed transition amounts or rates are unjust or unreasonable, or in any way reduce or impair the value of transition property either directly or indirectly by taking fixed transaction amounts into account when setting other rates for the electrical corporation . . . ."

In May 1997, SCE applied to the CPUC for a financing order for the 10 percent rate reduction and for issuance of the rate reduction bonds, confirming that the rate reduction would benefit only specified residential customers and GS-1 small commercial customers. All of SCE's filings were a matter of public record. In July, SCE and other major electric utilities filed a "Joint Direct Access Implementation Plan" which explained, among other things, that the "criteria for determining customer eligibility [for the rate reduction] in each case [would differ among the utilities] because of their different rate schedule eligibility criteria." In August, the CPUC invited all interested parties, including the public, to comment upon its proposed financing orders, but no one voiced any objection. The CPUC approved SCE's financing order in September.[5]

In December, in reliance on the financing order, SCE calculated the amount of rate reduction bonds to be issued to provide savings sufficient to offset the 10 percent rate reduction for the eligible consumers and filed an "Advice Letter" to establish the fixed transaction account charges for the GS-1 rate groups according to the formula provided in the financing order. SCE provided the discount to its eligible customers beginning on January 1, 1998.[6]

## C.

In April 2001, Anchor Lighting (a commercial business) filed a class action against SCE (and Edison International, which is included in our references to SCE), alleging that although it was a small commercial customer within the meaning of subdivision (h) of section 331 and thus entitled to the 10 percent rate reduction provided by subdivision (w) of section 330, SCE had failed to give it the required reduction. SCE's demurrer was sustained with leave to amend, and Anchor filed a first amended complaint in September, alleging five causes of action, all variations on this same theme (violations of section 330, a common count for money had and received, unjust enrichment, fraud, and violations of the unfair competition law), and asking for damages in the amount it would have saved with the discount, imposition of a constructive trust, and injunctive relief.

In March 2002, Anchor filed the same claim with the CPUC, contending "small commercial customer" means a customer with a maximum peak

---

[5] The CPUC's approval order stated: "The rate reduction applies to residential and small commercial customers as defined by [the Act]. For this purpose, SCE's eligible customers are those served on rate schedules in Edison's Domestic and General Service (GS-1) rate group. . . . All other customers will neither receive the rate reduction nor be responsible for [the Fixed Transaction Account] charges."

[6] Although the discount is no longer in effect, the CPUC monitors repayment of the fixed transaction account charges that are still paid by the customers who received the discount.

demand of less than 20 kilowatts in any given monthly billing period (so that Anchor and other businesses could be a small commercial customer one month but not the next, depending on its monthly demands).

In the trial court, SCE demurred to the first amended complaint, which the trial court sustained in May 2002, finding it lacked jurisdiction to consider most of Anchor's claims (leaving only the causes of action alleging fraud and violations of the Unfair Business Practices Act). The trial court then stayed the action pending the CPUC's determination of Anchor's concurrent administrative claim.

In August 2003, the CPUC dismissed Anchor's administrative claim with prejudice, finding (1) that its prior decisions approving SCE's tariffs were "final and conclusive" because no one had suggested (during the public comment period on SCE's proposal or at any other time) that SCE's proposal conflicted with section 331, subdivision (h); (2) that Anchor's claim was an impermissible indirect challenge to the CPUC's interpretation of section 331, subdivision (h), "as developed in [its] cost recovery plan decision, the financing order decision, and the direct access implementation plan decision"; (3) that Anchor's challenges to the CPUC's decisions and orders were an improper collateral attack prohibited by section 1709; and (4) that SCE did not in any way mislead the CPUC with regard to its application of the proposed rate reduction (so that Anchor was not entitled to pursue a claim of "independent liability" against SCE on the ground that SCE had failed to comply with the CPUC's orders or the Public Utilities Code). Anchor's application for a rehearing was denied, and it did not seek review of the CPUC's decision in the Court of Appeal or the Supreme Court.

In February 2004, Anchor filed a second amended complaint limited to its causes of action for fraud and violations of the unfair competition law, then abandoned its fraud cause of action. In May 2005, the trial court granted SCE's motion for summary judgment on the remaining cause of action, and this appeal is from the judgment thereafter entered.

## DISCUSSION

### I.

When the trial court sustained SCE's demurrers, it did so on the ground that it lacked jurisdiction to hear Anchor's challenge to SCE's rates. Anchor contends the trial court was wrong. We disagree.

### A.

The CPUC is constitutionally empowered to regulate utilities and to fix rates, establish rules, hold various types of hearings, award reparation, and

establish its own procedures (Cal. Const., art. XII, §§ 1–6), and legislatively empowered to do "all things . . . necessary and convenient in the exercise of such power and jurisdiction." (§ 701; and see *Consumers Lobby Against Monopolies v. Public Utilities Com.* (1979) 25 Cal.3d 891, 905 [160 Cal.Rptr. 124, 603 P.2d 41] [the CPUC's powers are liberally construed].)

■ The CPUC has exclusive jurisdiction over the regulation and control of utilities and that jurisdiction, once assumed, cannot be hampered or second-guessed by a superior court action addressing the same issue. (*Barnett v. Delta Lines, Inc.* (1982) 137 Cal.App.3d 674, 680 [187 Cal.Rptr. 219]; *Pacific Tel. & Tel. Co. v. Superior Court* (1963) 60 Cal.2d 426, 429–430 [34 Cal.Rptr. 673, 386 P.2d 233].) To that end, subdivision (a) of section 1759 provides: "No court of this state, except the Supreme Court and the court of appeal, to the extent specified in [the Public Utilities Code], shall have jurisdiction to review, reverse, correct, or annul any order or decision of the [CPUC] or to suspend or delay the execution or operation thereof, or to enjoin, restrain, or interfere with the [CPUC] in the performance of its official duties, as provided by law and the rules of court." By its plain language, section 1759 deprives the superior court of jurisdiction to entertain an action that could undermine the CPUC's authority. (*San Diego Gas & Electric Co. v. Superior Court* (1996)13 Cal.4th 893, 914–915 [55 Cal.Rptr.2d 724, 920 P.2d 669] [hereafter *Covalt*, the name of the real party in interest]; *Wise v. Pacific Gas & Electric Co.* (1999) 77 Cal.App.4th 287, 293 [91 Cal.Rptr.2d 479]; *Waters v. Pacific Telephone Co.* (1974) 12 Cal.3d 1, 6, 10 [114 Cal.Rptr. 753, 523 P.2d 1161].)

■ Where the CPUC is required to interpret the Public Utilities Code, its interpretation (even if invalid) will not be disturbed unless " 'it fails to bear a reasonable relation' " to the statute's purposes and language. (*Southern California Edison Co. v. Peevey* (2003) 31 Cal.4th 781, 796 [3 Cal.Rptr.3d 703, 74 P.3d 795]; *Hickey v. Roby* (1969) 273 Cal.App.2d 752, 763–764 [77 Cal.Rptr. 486] [although "palpably erroneous in point of law," the CPUC's orders are binding and conclusive in all courts of this state unless annulled by the Supreme Court or Courts of Appeal].)

### B.

To avoid these rules, Anchor points to section 2106 and claims it confers jurisdiction in this case. Anchor is wrong.

■ Section 2106 authorizes an action in superior court for damages caused by a public utility's unlawful act.[7] ■ In *Waters v. Pacific Telephone Co., supra,* 12 Cal.3d at page 4, the Supreme Court held that " 'in order to resolve the potential conflict between sections 1759 and 2106, the latter section must be construed as limited to those situations in which an award of damages would not hinder or frustrate the [CPUC]'s declared supervisory and regulatory policies.' " (*Covalt, supra,* 13 Cal.4th at pp. 902–903.) In *Covalt,* the Supreme Court held that section 1759, as construed in *Waters,* bars a superior court action for property damage allegedly caused by the electric and magnetic fields arising from powerlines owned and operated by a public utility—because such an action "would impermissibly interfere with a broad regulatory policy of the [CPUC] on this subject . . . ." (*Covalt, supra,* 13 Cal.4th at p. 903.) Under the guidelines articulated in *Covalt,* the questions in this case are (1) whether the CPUC had the authority to adopt a ratemaking policy, (2) whether it exercised its authority, and (3) whether the present superior court action would hinder or interfere with that policy within the meaning of *Waters.* (*Covalt, supra,* 13 Cal.4th at pp. 923, 926, 935.) All three questions must be answered affirmatively.

■ First, the Electric Utilities Restructuring Act (Assem. Bill No. 1890 (1995–1996 Reg. Sess.)) gave the CPUC not only the authority but also the duty to adopt a ratemaking policy. (§§ 330, 340, 341, 368, 454, 491.) That the policy it adopted and enforced might have been incorrect or inconsistent with the Legislature's fiat is presently irrelevant because those claims had to be timely raised by a petition for review to the Court of Appeal or the Supreme Court (§ 1756; *Southern California Edison Co. v. Peevey, supra,* 31 Cal.4th at p. 796; *Hickey v. Roby, supra,* 273 Cal.App.2d at p. 763).[8] Second, as Anchor necessarily concedes, the CPUC has exercised its ratemaking power under the Act. Third, this lawsuit would unquestionably interfere with the CPUC's orders and, indeed, with the entire financing scheme.

---

[7] Section 2106 provides: "Any public utility which does, causes to be done, or permits any act, matter, or thing prohibited or declared unlawful, or which omits to do any act, matter, or thing required to be done, either by the Constitution, any law of this State, or any order or decision of the [CPUC], shall be liable to the persons or corporations affected thereby for all loss, damages, or injury caused thereby or resulting therefrom. If the court finds that the act or omission was willful, it may, in addition to the actual damages, award exemplary damages. An action to recover for such loss, damage, or injury may be brought in any court of competent jurisdiction by any corporation or person. [¶] No recovery as provided in this section shall in any manner affect a recovery by the State of the penalties provided in this part or the exercise by the [CPUC] of its power to punish for contempt."

[8] *Stepak v. American Tel. & Tel. Co.* (1986) 186 Cal.App.3d 633 [231 Cal.Rptr. 37], relied on by Anchor to support his claim of jurisdiction in this case, is inapposite. *Stepak* addresses the merger of utility companies as it affects shareholders' rights; shareholders' rights are not subject to the CPUC's regulatory powers.

■ On the latter point, an action pursuant to section 2106 "is barred by section 1759 not only when an award of damages would directly contravene a specific order or decision of the [CPUC], i.e., when it would 'reverse, correct, or annul' that order or decision, but also when an award of damages would simply have the effect of undermining a general supervisory or regulatory policy of the [CPUC], i.e., when it would 'hinder' or 'frustrate' or 'interfere with' or 'obstruct' that policy." (*Covalt, supra,* 13 Cal.4th at p. 918.) Because Anchor's lawsuit would if successful modify SCE's application of the 10 percent discount and its financing scheme, the interference with the CPUC's ratemaking function is clear. For this reason, section 2106 does not confer jurisdiction on the superior court. (*Schell v. Southern Cal. Edison Co.* (1988) 204 Cal.App.3d 1039, 1045 [251 Cal.Rptr. 667] [section 2106 does not apply where the "real gravamen" of the plaintiff's suit challenges the application of a rate schedule to a particular customer]; *City of Anaheim v. Pacific Bell Telephone Co.* (2004) 119 Cal.App.4th 838, 844–846 [14 Cal.Rptr.3d 725].)

For these reasons, the trial court had no jurisdiction to address the claims to which SCE's demurrers were sustained without leave to amend.

## II.

Anchor contends, alternatively, that the CPUC exceeded its authority by adopting "Schedule RRB," which Anchor says directly conflicts with the Public Utilities Code. We disagree.

### A.

Schedule RRB is part of SCE's October 1997 rate reduction bond submission to the CPUC. In its cover letter, SCE explained that Schedule RRB was established in accordance with the CPUC's earlier orders to provide "eligible customers with a 10 percent bill credit, excluding state and local taxes. The bill credit expires on the earlier of March 31, 2002, or the date the rate freeze is terminated. Schedule RRB also specifies which customers will pay the [fixed transaction amount charge] . . . ." By its express terms, Schedule RRB applies to residential customers and to GS-1 customers with a maximum peak demand of less than 20 kW who are served by SCE's rate schedules applicable to such customers.

### B.

Anchor contends Schedule RRB is inconsistent with section 331, subdivision (h), because it impermissibly restricts the definition of customers entitled to the 10 percent reduction. There are several problems with this argument.

■ First, Anchor does not explain how Schedule RRB conflicts with section 331, subdivision (h), which does no more than define "small commercial customer" as one with a "maximum peak demand of less than 20 kilowatts." The statute does not say whether the "peak demand" is to be calculated on a daily, weekly, monthly, yearly, or other basis, and the CPUC was entitled to "fill in" the gap by accepting SCE's formula. (See fn. 3, *ante*.)

Second, the CPUC rejected the same argument, finding that Anchor's contention that the 10 percent rate reduction would apply to anyone who has demand of less than 10kW is a challenge to the CPUC's interpretation of § 331, subdivision (h), as developed in the cost recovery plan decision, the financing decision, and the direct access implementation plan decision. "Since the relief that [Anchor sought was] based on an alleged conflict of SCE's Rule 1 and Schedule RRB with § 331(h), the relief, if granted, would involve modifying the text of SCE's Rule 1 and Schedule RRB, as well as the text of the direct access implementation plan decision and the financing order decision."

Third, the CPUC's findings are binding and conclusive because Anchor did not petition for review as permitted by section 1756. (*Hickey v. Roby, supra,* 273 Cal.App.2d at p. 763.)[9]

## III.

We quickly dispose of Anchor's remaining arguments.

First, Anchor is simply wrong when it says it seeks a remedy for past misconduct only and that its lawsuit thus could not interfere with any ongoing program. Although the 10 percent discount is no longer in effect, the financing scheme is alive and well. To state the obvious, a judgment nullifying the rates would necessarily affect the bonds and other financing vehicles that funded the reduced rates.

Second, the CPUC has not "declined to resolve this case." The CPUC's 55-page decision discussed and rejected all the claims raised in this lawsuit,

---

[9] In a related argument, Anchor contends the superior court nevertheless has jurisdiction to render a "legal conclusion" (as opposed to a factual finding) in conflict with the CPUC's legal conclusion. Leaving to one side the fact that the superior court has no jurisdiction to consider the issue, let alone reach a legal conclusion, Anchor is wrong. The case Anchor relies on, *Hartwell Corp. v. Superior Court* (2002) 27 Cal.4th 256 [115 Cal.Rptr.2d 874, 38 P.3d 1098], was an action against water providers for property damage caused by harmful chemicals in the water. The case has nothing to do with the CPUC's ratemaking authority, and holds only that section 1759 does not bar a superior court action against a utility with regard to issues that are not subject to CPUC regulation. (27 Cal.4th at p. 280.)

finding that Anchor was *not entitled to any remedy* because Anchor had not timely challenged the CPUC's earlier decisions *and* because "the record in the [CPUC's] various proceedings and . . . decisions clearly demonstrate[d] that no misrepresentations [by SCE] occurred . . . ." For this reason, we reject as pure sophistry Anchor's claim that it is entitled to pursue this lawsuit because the CPUC cannot provide a remedy.

█ Third, Anchor's remaining claims—as well as those discussed above—are in any event barred by the doctrine prohibiting collateral attacks against a utility. (*Northern Cal. Assn. v. Public Util. Com.* (1964) 61 Cal.2d 126, 135 [37 Cal.Rptr. 432, 390 P.2d 200] [a party cannot cure its failure to contest CPUC orders directly by later seeking judicial review of those orders by means of a lawsuit against the utility charged with applying those orders]; *Young v. Ind. Acc. Com.* (1944) 63 Cal.App.2d 286, 291–292 [146 P.2d 693].)[10]

█ Fourth, Anchor's action under the unfair competition law (Bus. & Prof. Code, § 17200 et seq.) is premised on Anchor's allegation that SCE violated the law by refusing to apply the 10 percent rate reduction to its GS-2 customers. Because the superior court has no jurisdiction to decide the underlying claim, it adds nothing to say that the same claim might also have constituted a violation of the unfair competition law. (*People ex rel. Orloff v. Pacific Bell* (2003) 31 Cal.4th 1132, 1144 [7 Cal.Rptr.3d 315, 80 P.3d 201].) The case relied on by Anchor, *Greenlining Institute v. Public Utilities Com.* (2002) 103 Cal.App.4th 1324 [127 Cal.Rptr.2d 736], does not address the superior court's fundamental jurisdiction to hear claims barred by section 1756 and thus adds nothing to Anchor's argument. (See *Rosen v. State Farm General Ins. Co.* (2003) 30 Cal.4th 1070, 1076 [135 Cal.Rptr.2d 361, 70 P.3d 351] [a case is not authority for a proposition not considered].)

Fifth, we summarily reject Anchor's contention that section 1759 is not a bar to its action against Edison International, SCE's holding company. Anchor offers no references to the record to tell us whether Edison International is regulated by the CPUC, no argument to suggest a purpose for the abstract pursuit of a parent corporation whose potential liability for the acts

---

[10] The CPUC reached the same conclusion, noting that this lawsuit (which was then stayed) "amounts to a collateral attack on the underlying [CPUC] decisions. [Anchor's] allegations that SCE's Rule 1 and Schedule RRB violate § 331(h) and certain [CPUC] decisions is an untimely attempt to revisit the determinations that were made in the cost recovery plan decision, the financing order decision, and the direct access implementation plan decision. . . . [Anchor] seek[s] to change those decisions by having the [CPUC] alter SCE's Rule 1 and Schedule RRB to extend the 10% rate reduction to GS-2 rate group customers with usage of less than 20kW. Such collateral attacks on final [CPUC] decisions are specifically precluded by § 1709." If Anchor disagreed, it should have filed a petition for review under section 1756.

of SCE seems to be a figment of Anchor's imagination, and no authority to support any part of this claim.

## DISPOSITION

The judgment is affirmed. SCE is awarded its costs of appeal.

Mallano, Acting P. J., and Rothschild, J., concurred.

A petition for a rehearing was denied September 19, 2006, and appellant's petition for review by the Supreme Court was denied November 15, 2006, S147201.